220 N.J. Super. 135 (1987)
531 A.2d 757
CHARLES WARE, PLAINTIFF-RESPONDENT,
v.
PRUDENTIAL INSURANCE COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1987.
Decided September 21, 1987.
*136 Before Judges O'BRIEN, SKILLMAN and LANDAU.
Vincent J. Apruzzese argued the cause for appellant (Apruzzese, McDermott, Mastro & Murphy, attorneys; Vincent J. Apruzzese, on the brief).
Arnold Feldman argued the cause for respondent (Ballen, Keiser & Gertel, attorneys; Arnold Feldman, of counsel; Sheldon A. Weiss, Linda P. Torres and Arnold Feldman, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
Plaintiff was employed by defendant as the district manager of its Haddon Heights office. On February 2, 1983, he was discharged.
*137 Plaintiff filed suit claiming that his discharge constituted (1) a breach of his employment contract and (2) a violation of public policy. The case was bifurcated and tried first on liability only.
The jury returned a verdict in favor of defendant on plaintiff's claim that his discharge violated public policy. However, the jury found that defendant had breached its employment contract with plaintiff by failing to follow the procedures applicable to the termination of managers. The case was subsequently tried on damages before another jury which returned a verdict in favor of plaintiff in the amount of $1,250,000.
On appeal defendant argues that the trial court erred in the liability trial in not granting judgment in its favor either at the close of plaintiff's case or after the presentation of all evidence, in granting partial summary judgment in favor of plaintiff, in failing to grant defendant's motion for a new trial and in failing to properly instruct the jury as to the applicable law. With respect to the damages trial, defendant argues that the trial court erred in not granting a mistrial after the opening statement of plaintiff's counsel, in not permitting defendant to show that plaintiff would have been terminated even if a probationary period had been utilized and in refusing to permit defendant to argue to the jury that plaintiff failed to mitigate damages. Defendant also argues that the jury's verdict on damages was against the weight of the evidence and that it was procured through the use of fraud, misrepresentation and misconduct on the part of plaintiff. We conclude that the trial court erred in not granting a judgment in defendant's favor at the close of plaintiff's case. Accordingly, we reverse and remand for the entry of judgment in favor of defendant. In view of this disposition, we find it unnecessary to reach the other points raised by defendant.
Defendant's insurance sales force is divided into geographic areas, which are called districts. Within a district, the sales force consists of agents, sales managers and a district manager. Agents call on and service insureds. Sales managers have *138 some supervisory responsibility with respect to agents and also deal directly with insureds. The district manager is at the next and highest level in the district hierarchy. The district manager has general supervisory responsibility over all employees in the district. As district manager for the Haddon Heights district, plaintiff supervised 5 sales managers, 48 agents and 9 clerical employees.
When plaintiff was promoted to the position of district manager, he signed a written employment agreement. Section 5 of this agreement states that "[t]he Manager's appointment and this Agreement may be terminated by either party at any time" and section 3(e) states that "[t]he Manager agrees that the company ... [s]hall not be bound by any alteration of the terms and conditions of this Agreement unless such alteration is made in writing by one of its officers." It is further noted that section 6 states that "[t]his Agreement supersedes any previous agreement the Manager may have had with the Company."
Plaintiff concedes that on its face this agreement established an at will employment relationship under which defendant was free to discharge him without cause and without following any prescribed procedures. However, plaintiff contends that this written employment agreement was modified by various contemporaneous and subsequent oral and written statements by defendant's representatives, pursuant to which defendant made a commitment to plaintiff and other employees not to discharge or to take other negative employment action except in accordance with prescribed procedures.
In support of his claim, plaintiff relies primarily upon Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284 (1985), mod., 101 N.J. 10 (1985), which was decided several months after the liability trial in this case. In Woolley, the Court held that "... absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer *139 even when the employment is for an indefinite term and would otherwise be terminable at will." 99 N.J. at 285-286.
Plaintiff's claim that he was entitled to job security in his position with defendant rests upon a document entitled, "Guide for Vice Presidents, Regional Marketing" (hereinafter referred to as "the Guide"). This document, a 1981 revision of an earlier similar document, was sent to each Vice President for Regional Marketing, which was the next higher position in defendant's management hierarchy above the position of district manager formerly held by plaintiff. A memorandum by Martin Leeds, Vice President for District Agencies, forwarding the Guide to the Vice Presidents for Regional Marketing, stated that "[t]he new Guide has been up-dated to reflect current District agencies policy and will serve as a valuable reference for you and your regional staff." The Guide was not sent to plaintiff or to any other person at his level in the company.
The Guide contains three parts relied upon by plaintiff: (1) "Position Description and Responsibility, Vice President, Regional Marketing, District Agencies Department," (2) "Setting Objectives and Performance Evaluation" and (3) "Procedure to be Followed for Managerial Changes Involving Demotion, Early Retirement or Transfer."[1] The first section contains a general description of the management responsibilities of a Vice President, Regional Marketing. The second section requires the Vice President, Regional Marketing, to establish standards of performance for each district manager and to evaluate the performance of each manager in relation to the job standards established during the planning process. Where performance does not meet the standards, a district manager can be placed on probation. If probation is required due to the failure of a district to satisfy performance standards, the Vice President is advised to follow the steps outlined in the third section of the Guide relied upon by plaintiff. This section states that "[o]ur *140 efforts should be directed toward helping each sales manager do a better management job" but where a certain manager "is not measuring up to expectations" the Vice President, Regional Marketing, may have to consider placing the manager on probation. The Vice President, Regional Marketing, is required to submit to his superior, who is the Vice President, District Agencies, a plan which includes objectives for the contribution of the district to regional goals, progress in achieving these goals, and recommendations as to improvement during the probationary period. If the desired improvement in performance is not forthcoming, the manager may be demoted, transferred or placed on early retirement.
Plaintiff testified that he was assured by higher level management employees that the signing of an employment agreement was a mere formality and that his basic relationship to defendant was governed by its personnel manuals. Such assurances were allegedly given to plaintiff when he signed the employment agreements for the positions of sales manager and district manager. Specifically, plaintiff was allegedly told by his immediate superior, Edward G. Kissler, that any problem in his performance would be discussed with him orally and that a proposed solution to the problem would be proposed, that he could be placed on formal probation for six months if he was unable to solve the problem based on the initial discussions, and that defendant would not take any adverse personnel action unless the problem could not be solved within this formal probationary period.
On the other hand, Vincent Trocchio, the Vice President, Regional Marketing, to whom plaintiff was responsible, testified that the Guide was not intended to be a personnel manual for district managers. Rather, it was intended to be a management guide for the four persons occupying the position of Vice President, Regional Marketing, in defendant's eastern region. Hence, it was distributed on a very limited basis. In addition, Trocchio testified that the procedures set forth in the Guide for counselling district managers and placing them on probation *141 apply only to failures to meet productivity standards and other deficiencies in performance, and not to insubordination or other violations of company rules which would provide grounds for termination.
Trocchio further testified that plaintiff was terminated because he urged the salesmen in his district to sell replacement policies to insureds, which was contrary to company policy.[2] Trocchio first learned of this practice in 1981 and warned plaintiff that he was "going the route of" another manager who had been terminated. Subsequently, the Chairman of the Board of defendant received a letter enclosing a tape recording of a sales meeting conducted by plaintiff in which he allegedly strongly advocated the selling of replacement policies for existing policies. This tape was played for plaintiff in December 1981 by Trocchio, who told plaintiff that the sales practices he was urging were improper. Trocchio also sent plaintiff a letter on December 28, 1981, which stated among other things:
[I]t is apparent this replacement activity is going on with your knowledge and consent.... We will not condone replacement activity of any type, threats of any kind, or the use of abusive language on the part of management. I feel confident that you will take the steps to correct this condition, and would appreciate your writing to advise me that it will not be necessary to review these items with you again.
Another sales meeting conducted by plaintiff was taped on September 17, 1982 and again sent anonymously to the Chairman of the Board of defendant. The management of defendant felt that this tape also showed that plaintiff was advocating improper sales practices to the agents under his supervision. Trocchio played this second tape in plaintiff's presence on January 20, 1983 and discussed its contents with him. Based on this discussion and an internal investigative report, Trocchio determined that plaintiff should be terminated. Trocchio testified that plaintiff was terminated

*142 ... based on the fact that he was advocating replacements; that he would not comply whenever I told him to change his methods of operation; he was not promoting the welfare of the company as a manager should be; he was always out of step with the rest of the company. Any time he was told something he disagreed. His way was the only way.
Consequently, after securing the approval of the Vice President for District Agencies, Trocchio notified plaintiff that he was being terminated immediately.[3] Trocchio also testified that the grounds for plaintiff's termination  the failure to follow the company's regulations  were not encompassed by the Guide and hence the procedures set forth therein, including a formal six month probationary period, were not followed.
Based on this evidence the trial court denied defendant's motion to dismiss at the close of plaintiff's case. In addition, the trial court granted a partial directed verdict in favor of plaintiff at the close of defendant's case, concluding that as a matter of law plaintiff's employment contract was modified by the Guide. As previously noted, the jury which heard the trial on liability subsequently determined that defendant had breached its contract with plaintiff.
The essential issue presented by this appeal is whether the principles of Woolley v. Hoffmann-La Roche, supra, should be extended to a situation where a management employee has an individual written employment contract which expressly states that his employment is at will and where the documents distributed to him by management to guide his supervision of lower level employees are silent with respect to his own employment rights.
The basic principle of Woolley is that "... when an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary ... should construe them in accordance *143 with the reasonable expectations of the employees." 99 N.J. at 297-298. In determining the "reasonable expectations" of Woolley, the Court emphasized that, like most of his co-employees, plaintiff had been employed "without any individual employment contract." 99 N.J. at 299. Therefore, the Court concluded that when he was "given this one document that purports to set forth the terms and conditions of his employment [the employment manual]," it was "almost inevitable" that he would "regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment." Ibid.
In contrast, plaintiff had an individual employment contract, which stated that "[t]he Manager's appointment and this Agreement may be terminated by either party at any time," and further provided that "[t]he Manager agrees that the Company ... [s]hall not be bound by any alteration of the terms and conditions of this Agreement unless such alteration is made in writing by one of its officers." Furthermore, whereas the employer in Woolley was not unionized, the insurance agents employed by defendant were unionized and had entered into a collective bargaining agreement which governed their complete employment relationship with defendant, including the procedures required to be followed before their employment could be terminated.[4] Therefore, it may be concluded that the "reasonable expectation" of defendant's insurance agents was that their employment relations were not governed by any personnel manual but rather, in the case of non-supervisory employees, by collective bargaining agreements, and in the case of supervisory employees, by individual employment contracts. Cf. McQuitty v. General Dynamics Corp., 204 N.J. Super. 514 (App.Div. 1985).
*144 The Court in Woolley also emphasized that a company's general personnel practices embodied in a policy manual do not automatically become legally binding terms and conditions of employment. To avoid this consequence, "[a]ll that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; ... and that the employer continues to have the absolute power to fire anyone with or without good cause." 99 N.J. at 309. Since an employer may avoid any legally binding effect being given to personnel policies set forth in a policy manual by a unilateral statement in the manual, it follows a fortiori that this effect may be avoided by the execution of a written employment contract by which the employee expressly agrees to an at will employment status. See Batchelor v. Sears, Roebuck & Co., 574 F. Supp. 1480 (E.D. Mich. 1983); Novosel v. Sears, Roebuck & Co., 495 F. Supp. 344 (E.D. Mich. 1980). Here, plaintiff expressly agreed that his employment agreement could be "terminated by either party at any time." Furthermore, plaintiff may not avoid the explicit terms of his written employment contract by asserting that oral assurances of job security, inconsistent with the contract, were given to him when it was executed. See Borbely v. Nationwide Mutual Ins. Co., 547 F. Supp. 959, 970-971 (D.N.J. 1981).[5]
The limited distribution and obvious internal management objectives of the Guide is a further reason for concluding that plaintiff and other employees of defendant could not have had a "reasonable expectation" that the document was intended to confer "employee benefits." The document was addressed to the Vice Presidents, Regional Marketing, for the Eastern Division. Only four persons occupied this position. Copies also were sent to certain other high level executives and/or their *145 administrative assistants. No copy was sent to plaintiff or any other employee at his level of management. Nor does the record indicate that there was any organized program to disseminate the contents of the document to employees other than those to whom it was sent.
The Guide was transmitted by a memorandum from the Vice President, District Agencies. The transmittal memorandum contains a description of the contents of the Guide which clearly indicates that its subject is the management responsibilities of Vice Presidents, Regional Marketing, and not the benefits of the employees who serve under them:
For your information, the Guide includes two sections pertaining particularly to EHO.

Regional Home Office Organization  includes the following EHO organizational charts:
. . Eastern Home Office
. . District Agencies Regional Sales Offices
. . Agencies Administration and Field Services Division
. . Underwriting and Issue Division
. . Ordinary Policy Service  NY
. . Ordinary Policy Service  NJ
. . Debit Policy Service Division
. . Management Information Division

Objectives  outlines the objective setting process in sales, expense and affirmative action.
There is also a new section on Losses and Surpluses which includes both general guidelines and specific instructions for dealing with problems such as: Agents Losses of Company funds, Burglaries, Defalcations of Company funds, and Surpluses, etc.
Furthermore, the sections of the Guide upon which plaintiff relies deal solely with the development of performance standards, evaluation of performance, and the procedures to be followed when a district's performance has been deficient. These procedures include counselling the manager and a period of probation. If the district's performance does not improve, the Guide further provides for the "demotion, early retirement or transfer" of the manager. Thus, the focus of this section is upon the performance of the district, not the employment rights *146 of the manager.[6] Indeed, the Guide does not deal at all with causes other than poor performance for removing a manager from his position, such as violations of the law, personal derelictions or failures to comply with company regulations. This is an understandable limitation upon the scope of the authority of a Vice President for Regional Marketing only if the sole intent of the Guide is to enable him to improve performance within his region by removing persons who have shown a lack of management capabilities from management positions.
The fact that defendant did not distribute the Guide to plaintiff but rather gave him a different guide which is silent with respect to the employment rights of managers also indicates that the intent of the Guide  as well as other policy guides issued by defendant  is solely to delineate management responsibilities. Consistent with this intention, the document distributed to plaintiff contained a detailed description of his management responsibilities, including the procedures he should follow if a sales manager or agent under his supervision failed to perform properly. If the document was intended to serve as a handbook guaranteeing employee benefits, it would be reasonable to expect that it also would specifically set forth those benefits. See Tobias v. Montgomery Ward & Co., 362 N.W.2d 380 (Minn. Ct. App. 1985). For example, in Woolley, Hoffmann-La Roche distributed a single employment manual, entitled "Hoffmann-La Roche, Inc. Personnel Policy Manual," which was described as covering "all employees of Hoffmann-La *147 Roche," 99 N.J. at 287 n. 2, and included a specific section on "[t]ermination" that stated "... the company's philosophy with respect to termination of employees and provides uniform guidelines for the administration of this policy." 99 N.J. at 310. In contrast, the Guide distributed to plaintiff is silent with respect to his employment rights. Therefore, we conclude that the guides distributed by defendant were intended to delineate management responsibilities at each level within the corporate hierarchy and not to confer benefits upon employees at levels below the persons to whom the guides were distributed.
Accordingly, the judgment on appeal is reversed and the matter is remanded to the trial court for the entry of judgment in favor of defendant.

APPENDIX
The portion of the Guide for Vice Presidents, Regional Marketing relied upon by plaintiff reads in its entirety as follows:

POSITION DESCRIPTION AND RESPONSIBILITY VICE PRESIDENT, REGIONAL MARKETING, DISTRICT AGENCIES DEPARTMENT
The Vice President, Regional Marketing is charged with the responsibility and given the authority within the limits of established Company policy to conduct the District Agencies Department's business in the Region. These major responsibilities are:
To develop, in support of RHO and CORP objectives, the sales and other objectives and marketing plans for the Company's products in the Region.
To achieve the Region's objectives by working with and through the District Managers in the Region.
To control, within Company and RHO guidelines, the cost of achieving the objectives established for the Region.
To see that adequate measures are taken to conserve in force business and provide satisfactory service to policyholders.
To see that all Districts in the Region are adequately staffed with qualified personnel who are adequately trained and properly deployed.

*148 To build the strongest possible sales organization in terms of personnel and their deployment.
To provide the encouragement and leadership essential to accomplishing the overall Company objectives and responsibilities.
To build goodwill and public relations with the general public and other members of the insurance industry.
To carry out the duties as a Branch Office Designated Supervisor for the sale of equity products.
Reports to:
Regional Home Office Vice President, District Agencies.
Supervises:
District Managers Assistant to the Vice President Administrative Assistant Field Office Consultant
Functions of the Vice President, Regional Marketing

Objective Setting and Sales Planning

Function
The VP, RM has overall responsibility for establishing Regional objectives in support of those of the RHO and CORP and for sales plans to achieve those objectives.

Duties
Establish and utilize a process of accumulating facts concerning previous years' production results, manpower results, markets, economic factors, and any other information needed to forecast the succeeding year's results and establish objectives.
Establish Regional objectives that are in keeping with the Region's potential and supportive of the District Agencies total objectives.
Conduct conferences with each District Manager to establish the District objectives necessary for the proper contribution of the District to the overall Regional goal.
Prepare detailed plans for the Region, including marketing strategy, practices, methods and procedures that will be employed in the Region to achieve objectives.
*149 Planning for conferences, meetings, and sales promotion campaigns.

Duties
Establish plans for administering the CORP and RHO award programs.
Plan and implement Regional Management Meetings.
Prepare plans for participating in Trophy, Citation, and other District meetings.
Organize, initiate, and implement Regional sales promotion campaigns and meetings or seminars for the introduction of new products.

Direction and Control of Regional Results and Performance

Function
The Vice President, Regional Marketing is responsible for the attainment of Regional objectives and Affirmative Action Plans by ensuring effective direction and control of sales activities and manpower performance.

Duties
Secure and maintain a current copy of each District's objectives and plans. These are to be reviewed and reconciled with each Manager to form a basis for future direction and control.
Establish a system that will provide sufficient data to determine if established plans are being implemented and stated objectives are being met.
Conduct a continuing review of District and Regional costs, taking necessary action to control such costs in line with results and Company and RHO guidelines.
Conduct continuing evaluation of District results and situational factors to identify problem areas so corrective action can be taken.
Schedule and conduct performance reviews with each Manager.
*150 Provide Managers with specific guidance in those areas where a need for such guidance is required.

Manpower Responsibilities

Function
The VP, RM is responsible for staffing all Districts with sufficient numbers of qualified Management personnel. In addition, the VP, RM is responsible for the training and deployment of personnel in the Region in a manner that will maximize their effectiveness.

Duties
Maintain an up-to-date survey of probable Management personnel vacancies and an inventory of the actual and anticipated availability of personnel to staff these vacancies.
Implement procedures for District Management, Assistants to the Vice President and Sales Management candidate evaluation, selection, appointment, and placement.
Make recommendations for the promotion, transfer, demotion or termination of District Management personnel.
Promotes, transfers, demotes or terminates Sales Management personnel.
Train and develop present management personnel and establish procedures to identify, train, and develop potential management replacements.
Supervise Management in the recruitment, selection, and training of Agency candidates in conformity with established Company policy and Affirmative Action Plans.
With the aid of the Agencies Relations Division (CORP), supervise the administration and interpretation of the Union Contract.
Supervise Management in the recruitment, training, development, promotion, and direction of Field Service personnel.
*151 Establish and utilize a procedure for continuous appraisal of market penetration in the Region to recommend the manpower needed for securing increased growth at a reasonable cost.
Direct and aid District Management in the allocation of their manpower, so as to achieve maximum performance at reasonable cost.
Encourage, where appropriate and in line with Company policy, institutional training (e.g., CLU, LUTC, etc.)
See that members of Management are fully licensed to sell all Life, Health and P & C products offered by the Company.

Administration and Supervision

Function
The VP, RM is responsible for directing and supervising the activities of the Assistants to the Vice President and Field Office Consultant to administer and supervise effectively the programs developed for the Region. Also fiscal responsibility for Company funds and responsibility for the overall morale of the Region; administers procedures for selecting Field Office sites and setting Management salaries and allowances.

Duties
Makes District visits to provide and secure information and to direct and control progress toward District objectives.
Plans, arranges and conducts Regional Conferences and area meetings, for the purposes of training, communications, and development of good morale.
Takes necessary personnel administrative action with respect to Field and Regional Office personnel when necessary.
Administering and supervises procedures for the safeguarding of Company funds and accounts.
Controls expenses to achieve RHO and Company cost objectives.
Establish the functions and operation of the Regional Staff for administrative purposes and for service to the Field.

*152 Duties

To delegate and assign responsibilities to each member of the Region Staff.
Supervise the operations of the Staff.
Conduct performance reviews with each member of the staff at regular intervals to determine if the performance standards are being met and to establish new performance standards if needed.

Responsibility for Providing RHO  Region Liaison

Function
The VP, RM serves as a communications channel between top management and the Field and Service Staffs and between the Field and the RHO and CORP. Passes along important information that can be helpful in the formulation of overall Company policies. Interprets, communicates, and implements the policies and plans of the RHO so that they are more pertinent to the individual and can do much to build a constructive Company attitude. Establishes, maintains, and promotes industry relations within the Region.

Duties
Establishes and utilizes a procedure for interpreting and communicating to the Field staff the RHO objectives, plans, regulations, rules, policies and practices.
Establishes and maintains effective communications between the Field and the RHO and CORP.
Keeps the RHO informed of competitive (or competitors') policies, products, techniques and practices.
Promotes cooperation between District Agencies and other Departments within the Company (e.g., Group, Mortgage Loan, Ordinary Agencies).
Participates in community and industry affairs in the Region.

*153 Self Development

The VP, RM is responsible for following a program that leads to overall personal development; should be aware of the developments in the sales management and personnel areas; should attempt to strengthen those areas that will be most beneficial toward overall effectiveness in Regional operational.

Duties
Keeping up with current literature in the sales and management areas.
Securing the CLU and CPCU designations.

SETTING OBJECTIVES AND PERFORMANCE EVALUATION
Company policy and procedures to be followed in dealing with District Agencies Managers with respect to setting objectives and performance reviews are as follows:

I. Development of Performance Standards

It is the responsibility of the Vice President, Regional Marketing to establish fair and reasonable standards of performance for each District Manager and to be sure that those standards are communicated and understood.
At the time a new District Manager is appointed, a specific plan should be developed covering results expected from the District both on a long range basis and between the date of appointment and the end of the calendar year. This would include such elements as:
Sales results, including mix of business
Manpower, including Affirmative Action Plans
Expense and budget objectives
Personal training and development plans
Other objectives appropriate to the individual case
At the end of each calendar year the Vice President, Regional Marketing should hold a planning session with each District Manager to mutually agree upon specific performance objectives for the District during the ensuing calendar year.

II. Evaluation of Performance

A second essential responsibility of the Vice President, Regional Marketing is to evaluate the performance of each District Manager in relation to the job *154 standards which have been established in the planning process. This evaluation should be accomplished through a formal annual performance review with any understandings or agreements reached documented in writing.
The Vice President, Regional Marketing should not only recognize and encourage superior performance, but should also identify and take appropriate action when performance is less than satisfactory. In order to continue in the job, each District Manager is expected to meet the minimum objectives established during the planning session.
When performance does not meet or exceed the minimum objectives, it is the VP's, RM responsibility to determine the reasons for that occurrence and attempt to find satisfactory solutions. When unsatisfactory performance seems to be caused or influenced by health conditions, the VP, RM should discuss those conditions with the Medical Department.
The shortcomings and failures to meet agreed upon performance objectives should be documented and discussed with the District Manager whose performance is being evaluated.
Prior to recommending placing a District Manager on probation, the VP, RM should be able to document that for a period of at least six months immediately prior, the fact of unsatisfactory performance had been communicated to the Manager.
If formal probation becomes necessary, the steps outlined on pages DE1 and 2 should be followed.

PROCEDURE TO BE FOLLOWED FOR MANAGERIAL CHANGES INVOLVING DEMOTION, EARLY RETIREMENT OR TRANSFER
It is our desire to see all Managers meet with success in the performance of their duties. Our efforts should be directed toward helping our Managers do a better management job. Occasionally, despite the help and counsel that has been given, it will become apparent to the VP, RM that a certain Manager is not measuring up to expectations. In such cases, it will be necessary for the VP, RM to consider placing the Manager on probation prior to taking action such as demotion, early retirement, or transfer to another District.
Before taking the step of placing the Manager on probation the VP, RM should submit the following to the Vice President, District Agencies:
The objectives which had been established jointly with the Manager for the proper contribution of the District to the overall Regional goals.
The District's progress in achieving these goals. *155 Copies of correspondence with or from Manager, as well as memoranda regarding the District's unsatisfactory results for a period of at least the last six months, including identification of the problem areas and the planned corrective action.
Recommendations regarding the improvement that is expected during the probationary period and the action that will be taken if the improvement is not forthcoming.
When the plan has been approved, the VP, RM should proceed as follows in cases involving early retirement or demotion:
1. Personally interview the Manager and fully explain:
a. Why the interview is necessary  the District is not measuring up to sales expectations, turnover is excessive, new Agents are not succeeding, etc.
b. What is expected  this should be a reasonable objective, such as Region or Company average, whichever is lower; or such other objectives which may be higher or lower than the foregoing but which may be reasonable in the particular circumstances of the case.
c. When improvement is expected  this should be a reasonable period (six months is generally recommended).

When arriving at the date of decision, the VP, RM should consider proper timing  avoiding action on Christmas, birthdays, P.O.G. days, etc.
d. What action will be taken if improvement is not forthcoming.
2. The initial interview must be followed by the VP's, RM letter to the Manager confirming in detail that which was discussed.
The following statement should also be included in the letter:
"Until further notice, you shall not be entitled to any increase in Base Salary under Sections 3 and 4 of your Schedule of Compensation, which is hereby so amended."
An acknowledgement from the Manager must be obtained.
3. After the above action has been taken, the VP, RM should proceed as follows:
a. Plan on having a minimum of two visits with the Manager before the probationary period expires.
b. Each visit should be constructive in nature and every effort should be made to extend all possible help toward the goal of definite improvement.
c. Following each visit, the VP, RM should prepare a report, outlining what took place, and the nature and extent of the assistance given.
4. Shortly before the expiration of the probationary period, the VP, RM should submit a report and recommendation to the Vice President, District Agencies and obtain approval of the plan of action. (In demotion cases, the VP, RM should state specifically on what Staff the demoted Manager will be placed.)
a. Where the approved decision is to continue the individual in the present position, the VP, RM should write the Manager indicating that the Manager has met the requirements and that the probationary status has been lifted.

*156 b. Where the approved decision is not to continue the individual as a Manager nor is it in the Company's best interest to continue the individual in a working capacity and the individual is eligible for early retirement, consideration may be given in exceptional circumstances to the payment of a "separation" allowance, subject to Executive Vice President approval. A recommendation as to payment of such an allowance should be included in the report to the Vice President, District Agencies.
NOTES
[1] These provisions are set forth in the Appendix to this opinion.
[2] Such an activity may also violate the insurance laws under some circumstances. See N.J.S.A. 17B:30-6.
[3] Although the termination was immediate, plaintiff was given $36,600 in severance pay.
[4] These provisions did not apply to plaintiff because he was not a member of the union and his individual employment contract expressly stated that "[t]his Agreement supersedes any previous agreement the Manager may have had with the Company."
[5] However, we have held that where there is no written employment contract, oral assurances of continued employment made to an individual employee in furtherance of company policy may be enforceable in some circumstances. Shebar v. Sanyo Business Systems, 218 N.J. Super. 111, 118-121 (App.Div. 1987).
[6] Although our decision does not rest on this grounds, it could be concluded that the probationary procedures described in the Guide would be inapplicable in any event to the circumstances of plaintiff's termination. The grounds set forth in the Guide for placing a manager on probation all relate to deficiencies in performance, such as the failure to fulfill sales expectations, the lack of success of new agents or excessive turnover of staff. However, plaintiff was terminated for failing to comply with company regulations, which is a grounds for termination to which the Guide does not apply. It also might be concluded that Trocchio's meetings with plaintiff and the warning letter sent to him in December 1981 constituted substantial compliance with any requirement that a probationary period precede termination.