231 N.J. Super. 81 (1989)
555 A.2d 12
MARTHA PRESTON, PLAINTIFF-RESPONDENT,
v.
THE CLARIDGE HOTEL & CASINO, LTD., AND DEL E. WEBB CORPORATION, T/A THE CLARIDGE HOTEL & CASINO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 17, 1989.
Decided February 27, 1989.
*82 Before Judges MICHELS, MUIR, JR., and KEEFE.
W. Reed Gusciora argued the cause for appellants (DeGeorge & Avolio, attorneys; Sarabeth Egan, of counsel and on the brief).
*83 Carmen R. Faia argued the cause for respondent (Targan, Higbee & Faia, attorneys; Carmen R. Faia and Carol Higbee, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendant The Claridge Hotel & Casino, Ltd., now known as The Claridge at Park Place, Inc., d/b/a Del Webb's Claridge Casino Hotel (hereinafter referred to as "Claridge") appeals from a judgment of the Law Division entered on a jury verdict that awarded plaintiff Martha Preston damages in the sum of $67,000, together with interest, and from an order denying its motion for a new trial or, alternatively, a remittitur of damages, in this action for wrongful termination of employment.
In November 1980, plaintiff was hired by Claridge as a casino floor person and was responsible for supervising the blackjack and baccarat games. Prior to the opening of the casino in June 1981, Claridge held a general orientation meeting at which time a Claridge representative distributed Employee Handbooks to all employees. The representative explained what was expected of the employees and what, in turn, the employees could expect in terms of employment policies. All employees were required to read the handbook and sign a form which indicated that they understood that they could be terminated for violating the terms contained in the handbook. Approximately one year later, Claridge issued an otherwise identical "revised" handbook which contained a disclaimer advising employees that the handbook was not to be construed as a contract. Although no explanation was provided as to the significance of this disclaimer, all employees were required to read the revised handbook and sign the detachable acknowledgment form.
In August 1984, plaintiff was fired by Claridge after becoming involved in a dispute with a co-worker in the casino. Thereafter, plaintiff instituted this action for wrongful discharge and was awarded damages in the sum of $67,000. The *84 jury found that (1) Claridge was contractually prohibited from discharging plaintiff without just cause by virtue of the representations concerning maximum job security contained in the first handbook; (2) these obligations had not been extinguished by the disclaimer contained in the second or "revised" handbook; (3) plaintiff had not been fired for just cause and (4) plaintiff was entitled to $42,000 in current lost wages and $25,000 in future lost wages. The trial court awarded plaintiff pre-judgment interest on the $42,000 jury award. Claridge's motion for a new trial or, alternatively, a remittitur of the damages award, was denied. This appeal followed.
Claridge first contends that the decision reached in Woolley v. Hoffman-LaRoche, Inc., 99 N.J. 284 (1985), mod. 101 N.J. 10 (1985), should not be applied retroactively. We disagree. In Woolley, the Supreme Court held that a distributed company policy manual that is intended to cover the general work force may be construed as an implied contractual offer to abide by the terms contained therein. The operative determination under Woolley is whether the distributed manual or handbook could have led employees to reasonably believe that the company's "policies," particularly with respect to job security, would be honored as terms and conditions of employment, therefore, obviating the need for unionization. If plaintiff reasonably could have construed the employment handbook issued to her in 1980 as a contract of employment, then the purposes of the law set forth in Woolley would be furthered by a retroactive application of that decision. See Grigoletti v. Ortho Pharmaceutical, 226 N.J. Super. 518, 525-526 (App.Div. 1988), certif. granted, 113 N.J. 640 (1988); Giudice v. Drew Chemical Corp., 210 N.J. Super. 32, 35 (App.Div. 1986), certif. granted in part and remanded, 104 N.J. 465 (1986); Cole v. Carteret Sav. Bank, 224 N.J. Super. 446, 454 (Law Div. 1988). Hence, we hold that the principles of law enunciated in Woolley are applicable here.
*85 Claridge next contends that even if Woolley is applicable, the clear and prominent disclaimer in the second handbook extinguished any contractual job security obligations that may have existed. Although Woolley permits employers to utilize disclaimers to achieve such a result, the language in the disclaimer must indicate, in straightforward terms, that the employee is subject to discharge at will. Here, the disclaimer contained in the revised handbook did not convey that message.
As in Woolley, it is significant that the handbook was intended to cover all Claridge employees and was distributed at the orientation meeting to provide the employees with an idea of what they could reasonably expect from Claridge and what, in turn, was expected from them. Since all Claridge employees were required to read the handbook and sign a form which indicated that they understood that a violation of the terms contained therein could result in termination, it was reasonable for those employees to expect that compliance with those same terms would prevent their discharge without just cause. Thus, there was sufficient credible evidence in the record for the jury to have found that the first employee handbook created an implied contract of employment under which neither plaintiff nor any other permanent employee could be discharged without just cause.
Claridge attempts to distinguish the terms contained in its first handbook from those contained in the handbook issued by Hoffman-LaRoche in Woolley. Claridge contends that the termination procedures contained in the Woolley manual are more detailed and go to a greater length to spell out "just cause" than the termination procedures contained in the Claridge Employee Handbook and that the Claridge procedures apply only when an employee chooses to terminate his employment. Claridge, however, fails to account for the fact that its handbook provides a step-by-step procedure for dealing with employee problems; enumerates the types of prohibited conduct that may result in termination, and represents that *86 "[w]hile you work for the Claridge ... [y]ou will receive maximum job security." Claridge also fails to account for the fact that it supplied plaintiff with a detailed Policies and Procedures Manual which described its progressive four-step disciplinary scheme of (1) a verbal warning; (2) a written warning; (3) suspension, and (4) termination. Additionally, as in Woolley, Claridge's manual indicates that its personnel "programs and policies" are an alternative to unionization and collective bargaining agreements.
Although neither the Claridge Employee Handbook nor the Policies and Procedures Manual expressly declare that employees will be fired only for just cause, such a contractual agreement was created in view of the widespread distribution of the respective policy manuals and their application to the Claridge workforce at large; the required reading and signing of the employee handbooks; the provision of a progressive scheme of discipline for the enumerated types of prohibited conduct; the testimony of Claridge's Executive Director of Human Resources that it was Claridge's general policy to terminate employees only for cause, and, most importantly, the various representations of "maximum job security." Having offered these representations as an attractive alternative to collective bargaining, Claridge cannot avoid its obligations on the basis of semantic differences.
Claridge further contends that even if a contract of employment prohibiting termination without just cause was created by virtue of the initial handbook, the disclaimer contained in the second manual returned plaintiff to the status of an employee-at-will. Woolley dictates that "[t]he provisions of the manual concerning job security shall be considered binding unless the manual elsewhere prominently and unmistakably indicates that those provisions shall not be binding or unless there is some other similar proof of the employer's intent not to be bound." Woolley, supra, 99 N.J. at 307. It was well within the jury's province to determine that Claridge had not met this burden.
*87 The disclaimer set forth in the revised handbook reads as follows:
It is the policy of the Company that this handbook and the items contained, referred to, or mentioned herein, are not intended to create, nor should be construed to constitute, a contract of employment between the Company and any one or all of its personnel. This handbook and its items are presented only as a matter of information and direction regarding Company policy, benefits and other useful information.
However unequivocal this language may be in informing employees that the second handbook was not to be construed as a contract, it fails to explain the impact of the disclaimer upon the "maximum job security" provisions contained in both handbooks and the Policies and Procedures Manual. If Claridge wished to advise its employees that they could be discharged at will, such a warning should have been set forth expressly. As the Woolley Court explained:
It would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then to allow the employer to renege on those promises. What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause. [Woolley, supra, 99 N.J. at 309; (Emphasis added.)]
Here, the necessity of providing a disclaimer consistent with the language set forth in Woolley was particularly compelling in view of the circumstances under which the revised handbook was distributed. When the first handbook was distributed at the 1981 orientation meeting, the employees were told what they could expect in terms of employment and what would be expected of them. When the otherwise identical "revised" handbook was issued a year later, however, the employees were not "reoriented" as to the significance of the contractual disclaimer. *88 They were simply asked to pick up the handbook; read it, and sign the detachable acknowledgment form. This method of disclaimer is inconsistent with the "basic honesty" contemplated by Woolley. Since Claridge failed to utilize language akin to the straightforward disclaimer suggested in Woolley, the jury's finding that a contract of employment was created by the first handbook should not be disturbed. Cf. Ware v. Prudential Ins. Co., 220 N.J. Super. 135, 144 (App.Div. 1987), certif. den., 113 N.J. 335 (1988) (Where we held that a district manager's individually tailored employment contract, which expressly stated that his employment could be "terminated by either party at any time," was not modified to require discharge for cause by a document that was not distributed to him or to other employees at his level.)
Contrary to Claridge's argument, we are also satisfied that the future damages awarded to plaintiff were not based solely on speculation and conjecture. The recovery of damages in breach of contract actions is limited by the general principles that:
(1) the damages are those arising naturally according to the usual course of things from the breach of the contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as a probable result of the breach; and (2) there must be reasonably certain and definite consequences of the breach as distinguished from the mere quantitative uncertainty. [Tessmar v. Grosner, 23 N.J. 193, 203 (1957)].
Here, in view of the uncontroverted testimony as to plaintiff's past and present earnings and the status of her employment at Trump's Castle Casino, the jury could reasonably find that it would be two years before plaintiff would obtain a salary equivalent to that which she had been receiving at Claridge prior to her termination.
Finally, the trial court did not err in awarding prejudgment interest on the portion of the damages award which *89 represented the lost wages that had accrued since plaintiff's termination. Historically, prejudgment interest has been awarded on liquidated damages, Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 622 (1986); Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 131 (1976); Ellmex Const. Co., Inc. v. Republic Ins. Co., 202 N.J. Super. 195, 209 (App.Div. 1985), certif. den., 103 N.J. 453 (1986), but it was not awarded "where the damages [were] unliquidated and not capable of ascertainment by mere computation, or where a serious and substantial controversy exist[ed] as to the amount due under a contract." Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332, 341 (App.Div. 1956). See Rivers v. General Acc. Group, 192 N.J. Super. 355, 359 (App.Div. 1983); Passaic Val. Sewerage Com. v. City of Paterson, 107 N.J. Super. 436, 441 (Law Div. 1969), aff'd 113 N.J. Super. 148, 150 (App.Div. 1971). The rationale was that "the person who is liable for the debt does not know the sum he owes and cannot be in default until the amount he owes is determined by judgment." Kamens v. Fortugno, et al., 108 N.J. Super. 544, 549 (Ch.Div. 1970).
In Ellmex, supra, 202 N.J. Super. at 211, however, we observed that the distinction traditionally made between liquidated and unliquidated damages was called into question by our Supreme Court's decision in Busik v. Levine, 63 N.J. 351 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). There, the Court stated:
We mentioned earlier the judge-made limitation that interest should not be allowed if the claim was unliquidated. That limitation apparently rested upon the view that a defendant should not be deemed in default when the amount of his liability has not been adjudged. But interest is payable on a liquidated claim when liability itself is denied, even in good faith, Kamens v. Fortugno, 108 N.J. Super. 544, 552-553 (Ch.Div. 1970). The fact remains that in both situations the defendant has had the use, and the plaintiff has not, of moneys which the judgment finds was the damage plaintiff suffered. This is true whether the contested liability is for a liquidated or for an unliquidated sum. For that reason, the concept of a "liquidated" sum has often been strained to find a basis for an award of interest. [Busik, supra, 63 N.J. at 358-359 (Emphasis added)].
*90 In Ellmex, we noted the trend in other jurisdictions of allowing prejudgment interest on both liquidated and unliquidated claims, Ellmex, supra, 202 N.J. Super. at 211-212, and found this result to be consistent with the equitable purpose of such an award; namely, "to indemnify the claimant for the loss of what the moneys due him would presumably have earned if the payment had not been delayed." Id. at 212-213 (quoting Busik, supra, 63 N.J. at 358). Consequently, we reversed the trial court's denial of prejudgment interest on an unliquidated claim for property damage that the defendant insurer had disclaimed from coverage. In doing so, we stated that the distinction between liquidated and unliquidated damages is of little importance "where the question interfering with disposition of the claim is not the inability of the parties to agree upon the value of the claim but is rather an argument as to coverage." Ellmex, supra, 202 N.J. Super. at 213.
Applying these principles here, it is clear that while plaintiff's claim may have been unliquidated in the sense that Claridge could not compute the exact amount of lost wages until it received direct proof of plaintiff's earnings from the date of termination, the fact remains that up until the time of judgment, Claridge had exclusive use of the moneys that plaintiff would have earned and was entitled to recover. Additionally, Claridge's refusal to compensate plaintiff was not based on a dispute over the amount of moneys actually owed. Rather, Claridge has maintained from the start that the disclaimer provided in the revised handbook negated any contractual obligations for job security that might have arisen under the initial handbook. The jury, however, found that Claridge was liable for wrongfully discharging plaintiff and, therefore, it was within the trial court's broad discretion to award prejudgment interest on the $42,000 in lost wages that had accrued up to the date of the verdict.
Accordingly, the judgment and order under review are affirmed.