**Herbert BOGINIS, Plaintiff,**

v.

**MARRIOTT OWNERSHIP RESORTS, INC., Defendant.**

Civ. A. No. 93–1375–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 26, 1994.

Timothy Francis Brown, Watt, Tieder & Hoffar, McLean, VA, for plaintiff.

Julienne Wallis Bramesco, Marriott Corp., Bethesda, MD, for defendant.

## MEMORANDUM OPINION

HILTON, District Judge.

This case is before the Court on defendant's Motion for Summary Judgment, plaintiff's Motion to File Opposition One Day Out of Time, and plaintiff's Motion to Strike defendant's Motion for Summary Judgment on Breach of Contract Claim.

Plaintiff is a resident of the Commonwealth of Virginia. Defendant is a Delaware corporation with its principal place of business in the State of Florida. The matter in controversy exceeds $50,000 exclusive of in-

terest and costs, and jurisdiction is therefore proper pursuant to 28 U.S.C. § 1332.

Plaintiff claims that he was lured by misrepresentations to Marriott Ownership Resorts, Inc. ("MORI") from other employment, and was thereafter fired for refusing to acquiesce in MORI's violation of the law. He seeks money damages in the amount of $1,000,000. Plaintiff filed a Complaint on November 2, 1993, alleging misrepresentation (Count I), breach of contract regarding his position as Project Director in Barbados (Count II), breach of contract regarding the process of his dismissal from MORI, (Count III), and tortious wrongful termination (Count IV). Plaintiff has since voluntarily withdrawn Count II.

In the fall of 1991, plaintiff claims that he was contacted by MORI officials and offered a job as Project Director at a time share conversion project in Barbados known as the Barbados Beach Club ("the Barbados Project"). To induce him to take the position plaintiff alleges that MORI made the following promises:

(i) that Mr. Boginis would make more money than he made at [his former employer], with salary, bonus, overrides, and benefits estimated to total between $140,000 and $160,000 in the first year, with a good portion of the compensation tax-free;

(ii) that the project's occupancy rate was 98%, with the highest Honored Guest Award redemption rate in the Marriott system;

(iii) that there was a tremendous interest from repeat guests who could be contacted concerning condominium purchases;

(iv) that the Project hotel would be open and in service year round;

(v) that Mr. Boginis would receive full cooperation from hotel management;

(vi) that the Project when renovated would be first rate by Marriott standards;

(vii) that the project would be adequately supported by the home office in Lakeland, Florida;

(viii) that numerous well-trained sales personnel were available and interested in transferring to the Barbados Project;

(ix) that there was an experienced marketing director available for the Project;

(x) That owing to ownership of the Project by the Marriott family, the project was high profile and a priority for Marriott;

(xi) that Marriott would continue developing Caribbean projects and there was a substantial possibility for advancement to Regional Vice President in the Caribbean Region.

Plaintiff also claims that MORI failed to disclose several problems with the project, including the low quality of the project, the local crime and lack of employee housing.

Plaintiff claims shortly after he assumed his new duties at the Barbados Project, he determined that MORI had misrepresented the Project and his position as Project Director. After seven months he left Barbados to accept a position as Director of Sales in the New Jersey office on a temporary basis, expecting to be transferred to the Washington area when a position became available.

While at his new position in New Jersey, plaintiff fell into a disagreement with his supervisor, Joseph Cervasio, about the elevation of Bill Crim from quality assurance manager to sales manager. New Jersey law requires those who deal directly with customers to obtain a real estate license, and Mr. Crim had not yet done so.

Plaintiff raised the issue of Mr. Crim with Mr. Cervasio repeatedly but with no success. On March 19, Mr. Cervasio told plaintiff that he had decided to recommend to the home office in Florida that he be fired immediately because of the insubordinate nature of his repeated objections to Crim's elevation. Plaintiff contacted Cervasio's superior, Tom Bubrick, and objected to being terminated without just cause, written warning and counseling, and got no response. On April 9, 1993, Cervasio informed plaintiff that his position was being eliminated due to downsizing.

Plaintiff claims that his performance was superior at all times, and that he was terminated in violation of MORI's policies which precluded termination for performance-related reasons without written warnings and counseling.

MORI asserts that plaintiff's claims are "imagined wrongs," and the result of plaintiff's inability to deal with his inadequate performance. Although he complained that it was impossible to recruit an American staff, four of his eight salespeople were from the United States. He complained about the availability of housing, but found housing for himself, two miles away, and for his staff. He complained about not having a competent marketing director, and yet one was found for him promptly. Plaintiff also did not enter the project blindly. He visited the Barbados project for three days and two nights for "kind of an ongoing meeting" with the manager of the hotel and other Barbados staff.

MORI also asserts that plaintiff realized the pre-employment conversations with Joseph Cervasio and his brother Alan Cervasio about the job were expectations about the project. He knew, the company states, that discussions about the potential position were not part of a job offer because he was aware that others were still being interviewed for the position.

Plaintiff acknowledged that the term of employment had to be in his offer letter or they couldn't be honored. The length of the term of employment was not included in the contract, and plaintiff testified that he knew he could quit a job and that "I have an understanding that any employer can terminate, but the thought was not entered into my mind at that time."

The letter agreement of employment between Boginis and MORI, dated January 28, 1992, contains a merger clause which states:

> This agreement supersedes all prior agreements, written or oral, and sets forth the entire agreement between you and Marriott Ownership Resorts relating to the terms of your employment and may not be orally changed, modified, renewed or extended.

> I, *Herbert Boginis* [signature in the original], further understand that no such promise or guarantee of any type concerning the terms and/or conditions is binding upon the Company unless made in writing.

While plaintiff complains of events in the New Jersey office about Crim's license, he admits that Cervasio never told him that Crim need not get a license. Rather, he states that Cervasio actually prodded Crim to obtain a real estate license.

During December 1992, there was a hiring freeze, which was never withdrawn during plaintiff's tenure. Plaintiff was instructed to evaluate a large number of personnel for potential termination, and the sales and marketing staff underwent a reduction of one third by March 1993.

■ Grants of summary judgment motions are warranted if the pleadings, answers to interrogatories, admissions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law determines materiality. That is, only those facts that might be outcome-determinative under the current law are material. A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ District courts sitting in diversity actions must apply the choice of law rule of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Sneed v. American Bank Stationary Co., a Div. of ABS Corp.,* 764 F.Supp. 65, 66 (W.D.Va.1991). When the cause of action is one for tortious conduct, Virginia applies the doctrine of *lex loci delecti* and selects the law of the site of the tortious activity. *Ryder Truck Rental, Inc. v. UTF Carriers, Inc.,* 790 F.Supp. 637, 641 (W.D.Va.1992). When the cause of action is contractual in nature, Virginia choice of law rules generally require the contract to be governed by the law where the contract was made. However, if the contract is made in one state but is to be performed in a different state, the governing law is that of the place of performance. *Sneed,* 764 F.Supp. at 67; *Ryder Truck Rental,* 790 F.Supp. at 642. The policy behind this exception is that the

parties intended the law of the place of performance to govern, and that they would have expressed a contrary intent in the contract. *Sneed,* 764 F.Supp. at 67 (citing Michie's Jurisprudence *Conflict of Laws, Domicile and Residence* § 25 (1990)).

▪ The first cause of action is governed by Florida law. The alleged misrepresentations occurred while the plaintiff was in Florida being interviewed for potential employment by MORI or in telephone conversations when the person making the alleged misrepresentations was in Florida. *Palmer v. Beverly Enterprises,* 823 F.2d 1105 (7th Cir. 1987).

▪ The third cause of action, for breach of contract, is governed by New Jersey law. Although the contract was made in Florida, plaintiff was working in New Jersey at the time the claim arose.

▪ The fourth cause of action, for tortious wrongful termination, is also governed by New Jersey law. The place of the alleged tort is New Jersey, where Boginis was working at the time.

▪ Under Florida law, to state a claim for fraudulent misrepresentation, the following elements must be met: (1) a false statement concerning a specific material fact; (2) the representer's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the misrepresentation. *Johnson v. Davis,* 480 So.2d 625 (Fla.1985). *See also First Union Discount Brokerage Services v. Milos,* 744 F.Supp. 1145 (S.D.Fla.1990), *aff'd,* 997 F.2d 835 (11th Cir.1993) (to prove fraudulent misrepresentation, "the party alleging fraud must prove that the promisor either lacked the intention to perform the promise or specifically intended not to perform at the time the representation was made").

▪ In this case there is no evidence that the statements were false or that they were made with the knowledge of falsehood or negligence. The statements were statements of expectations regarding the business and its future prospects.

▪ None of the alleged failures to disclose is actionable. To be actionable nondisclosure there must be a fiduciary relationship, *Czarnecki v. Roller,* 726 F.Supp. 832, 839 (S.D.Fla.1989), and no such relationship was present here. While non-disclosure may also be actionable where one party has superior knowledge, *id.,* of facts that the plaintiff could not uncover with diligent inquiry, *Taylor v. American Honda Motor Co.,* 555 F.Supp. 59, 64 (M.D.Fla.1982), this does not apply in an arms-length transaction "unless some artifice or trick has been employed". *Taylor,* 555 F.Supp. 59. No such "artifice or trick" is discernable from these facts.

▪ The contract's integration clause also prevents any recovery on the oral promise. The plaintiff signed the contract clearly understanding that there were no promises outside the agreement. Florida law does not recognize the oral terms as consistent, additional terms of the contract. *E.g. Palmer v. Santa Fe Healthcare Systems, Inc.,* 582 So.2d 1234 (Fla.Dist.Ct.App.1991), review denied, 593 So.2d 1052 (Fla.1991).

▪ Plaintiff's claim for breach of contract is based on alleged oral representations and policies as stated in MORI's personnel handbook. New Jersey law recognizes a claim for breach of an employer's stated termination policies. In *Woolley v. Hoffman–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257, 1264 (1985), the New Jersey Supreme Court wrote:

> [W]hen an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary instead of grudgingly conceding enforceability of these provisions, should construe them in accordance with the reasonable expectations of the employees.

The *Woolley* court held that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will only be fired for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at

will." *Id.* 491 A.2d at 1258. The court further explained that there need be no reliance because it is presumed under the circumstances of a company manual. *Id.* 491 A.2d at 1268 & n. 10.

In *Preston v. Claridge Hotel & Casino, Ltd.*, 231 N.J.Super. 81, 555 A.2d 12 (App. Div.1989), the defendant hotel had distributed a manual which, among other things, outlined a four-step disciplinary scheme beginning with a verbal warning and culminating with termination. *Id.* 555 A.2d at 15. There was no clear disclaimer contained in the manual when the employee signed it, but a disclaimer was contained in a revised manual which the employee signed one year later. On appeal from a jury award in favor of the employee, the Superior Court of New Jersey, Appellate Division, found that there was sufficient evidence for the jury to have found that the first manual created an implied contract which gave plaintiff and her fellow employees the right to be terminated only for just cause. *Id.* 555 A.2d at 14.

In *Ware v. Prudential Ins. Co.*, 220 N.J.Super. 135, 531 A.2d 757 (App.Div.1987), *cert. denied*, 113 N.J. 335, 550 A.2d 450 (1988), the court addressed the question of "whether the principles of *Woolley v. Hoffman–La Roche* ... should be extended to a situation where a management employee has an individual written employment contract which expressly states that his employment is at will and where the documents distributed to him by management to guide his supervision of lower level employees are silent with respect to his own employment rights." The court there held that because the parties had agreed that the employment relationship was to be at will, the procedures set forth in the documents distributed by management did not invest the plaintiff with a contractual right to have them applied to his termination.

In this case, there is no provision in plaintiff's employment agreement that requires cause to terminate plaintiff. There is also no provision giving the plaintiff the right to certain procedures on termination. The merger clause expressly states that the agreement "supersedes all prior agreements, written or oral, and sets for the entire agreement" between the parties, and that it "may not be modified, renewed, or extended" orally. The merger clause in the agreement clearly states that it contains the entire agreement between the parties. The merger clause is a disclaimer of the termination procedures and standards.

The agreement allows for written modifications, and the plaintiff understood that requirement. His employment agreement was in fact amended to adjust his compensation. Had the parties intended the manual to be a part of the employment agreement, it could have been made a provision of the contract as were the other conditions.

■■■■■ New Jersey's Conscientious Employee Protection Act ("CEPA") protects employees who report his or her employer's violation of a law or rule or regulation to a supervisor or to a public body.[1] *Potter v. Village Bank of New Jersey*, 225 N.J.Super. 547, 543 A.2d 80 (App.Div.1988) (reporting suspected criminal activity to the authorities). Plaintiff's claim to be a whistleblower does not fit the wording of the statute. He does not allege that he ever attempted to contact any public body, including the New Jersey Real Estate Commission, with regard to his complaints about Mr. Crim's lack of a license. He directed his complaints to three of his superiors within MORI: Joseph Cervasio, Alan Cervasio, the National Director of Sales, and Pete Watzka, the MORI Vice President of Sales and Marketing.[2]

Plaintiff's complaints to Joseph Cervasio are not the type of statements contemplated by the statute. The phrase "disclosure to a

1. The statute provides, in pertinent part:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

(a) discloses or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, when there is a business relationship, that the employee reasonably believes is in violation of the law, or a rule or regulation promulgated pursuant to the law.
N.J.Stat.Ann. 34:19–3.

2. Boginis also discussed Crim's licensing status with John Langan, the Broker in the New Jersey office. However, Mr. Langan was not in the relevant chain of command, and the statute therefore does not apply to these discussions.

supervisor" contains the clear prerequisite that the whistleblowing be to someone other than the alleged actor. Likewise, the statements· to Pete Watzka do not protect the plaintiff because they took place after he had been told of his termination by Joseph Cervasio. The statute requires that statements be made prior to an employee's retaliatory termination.

While plaintiff discussed the Crim situation with Alan Cervasio, the most generous reading of the evidence is that he was terminated for insubordination to Joseph Cervasio. There is no evidence that he was terminated for circumventing his supervisor and bringing his concerns to those higher in the company or any regulatory authority. The whistleblower statute was not intended to protect those who have arguments with their supervisors, and the plaintiff's claim must fail.

The Motion for Summary Judgment is properly before the Court for determination and the plaintiff's Motion to Strike should be denied and allowing a one day extension for the filing of an opposition brief works no prejudice on the defendant.

An appropriate Order shall issue.