610 So.2d 1378 (1992)
Carmen V. STOW, Appellant,
v.
NATIONAL MERCHANDISE COMPANY, INC., Appellee.
No. 91-2891.
District Court of Appeal of Florida, First District.
December 31, 1992.
Rehearing Denied February 8, 1993.
*1379 Scott Thomas Fortune, Atlantic Beach, for appellant.
William H. Andrews & Timothy B. Strong, of Coffman, Coleman, Andrews & Grogan, Jacksonville, and Simon W. Selber, of Selber & Selber, Jacksonville, for appellee.
KAHN, Judge.
Carmen Stow, a 17-year employee of National Merchandise Company, Inc. (National), brought suit against her former employer after National discharged her on April 2, 1987. The sole count of her fourth amended complaint sounded in fraud. After appellant's presentation of evidence to a jury, the trial court directed a verdict against her, finding, as a matter of law, that her proof failed to establish the elements of actionable fraud. We affirm.
Appellee National is a wholesale company that buys goods for retail sale by the Pic-N-Save chain of stores. Leonard Setzer principally owns and serves as president of National. Carmen Stow came to work for National in 1970 as an office clerk. In 1977 she became National's head cosmetics buyer, earning approximately $11,000.00 that year. In 1982 Stow and certain other selected executive employees executed a contract called "Bonus Compensation Plan" (BCP). During her five years of participation in the BCP, Stow's compensation, including salary and bonus, increased *1380 by about $22,000.00. Her total earnings during 1986, the last full year of employment, came to $50,631.00.
The operative portions of the BCP provide as follows:
1. `Executive Employees' is defined as those employees whose names are listed on Schedule A attached to and hereby made a part of this Plan. Employees may be added to or removed from Schedule A by action of the Board of Directors of the Corporation amending such schedule to add or delete such employees as Executive Employees.
2. Each Executive Employee will receive a bonus at least equal to the bonus received by such Executive Employee for the preceding year provided that such Executive Employee is employed by the Corporation as an Executive Employee on December 31st of the year for which such bonus is being paid. For example, if an employee is employed as an Executive Employee on December 31, 1982, then his or her bonus for 1982 will be at least equal to his or her bonus for 1981.
3. The bonus payable to each Executive Employee is to be paid as soon after the end of the year for which such bonus is to be paid as is administratively feasible, but in no event later than 2 1/2 months after the close of such year.
4. Each Executive Employee whose name appears on Schedule A shall be notified in writing of the terms of this Plan.
5. This Plan shall continue until terminated by the Corporation. The Corporation shall have the right at any time and from time to time to amend or terminate the Plan, in whole or in part, provided, however, that any such amendment or termination shall not affect an Executive Employee's right to receive a bonus which has already been accrued prior to such amendment or termination.
Appellant forthrightly notes that, despite the BCP, her status was that of an at will employee, with neither Stow nor National bound to a particular term of employment. Appellant further agreed that, notwithstanding the BCP, National could have at any time 1) removed her from the list of employees covered by the BCP; 2) abolished the plan entirely; 3) discharged her on December 30 of any given year, thus thwarting her bonus entitlement for that year; or 4) paid her an earned bonus and then discharged her without cause. The thrust of the BCP is that any participant employed on December 31 of the year for which a bonus will be paid is entitled contractually to payment of the bonus by March 15 of the next year. Such contractual bonus must be in at least the same amount as that received by an employee the year before.
Stow proved at trial that the formal BCP was engendered by a 1981 Internal Revenue Service audit which resulted in a $984,000.00 upward adjustment in National's 1980 income. For tax years 1980 and before, National's practice had been to take a current year deduction against corporate income for discretionary bonuses which "accrued" during the tax year, but were not actually paid to employees until the following year. In 1981 IRS disallowed this practice, and set forth three requirements for permitting a deduction attributable to bonuses not actually paid until the following year: 1) the establishment of a mandatory obligation by National to pay specific employees a fixed bonus; 2) notification of those specific employees prior to the end of the year of National's binding obligation to pay the bonus; and 3) payment of the bonus as soon as administratively feasible after the close of the year.
By devising the BCP, National retained its right to charge off unpaid bonuses against current year income. The company thus realized annually a deferment of its income tax obligation. In turn, BCP participants gained a contractual right not to suffer reduced bonuses because of poor job performance, so long as they remained employed at the end of the year.
In March of 1986, Stow received her bonus for 1985 in the amount of $21,000.00. In March of 1987, Setzer met with Stow and presented her with a check in the amount of $17,500.00, representing her *1381 1986 bonus. In his trial testimony, Setzer related the following:
A. We met in my office. Mr. Kemp was there, Carmen Stow was there. This was on, I believe, the 17th or a Monday. And when she came into the office we had a long conversation. I told her that we had serious, serious problems in the department; that several people in the company were pressing me; that they felt it was not going to work out; that they  a couple of people had even brought up the point that I should terminate Mrs. Stow.
I told her that I could not do that, that I had a 17 year working relationship with her. She started off as a clerk. She had worked her way up through cigar. She had worked her way up into the cosmetics department and I wanted to see things work out; that I was not the type of person that was just going to tell her that it hasn't worked out and pay her the full bonus check and just let her go, because that was available to me.
And I felt the important thing to do was to talk to her about problems and talk to her about a resolution. And we started into it, Mrs. Stow brought up about the $3,500.00 and the fact that the check was less than the amount of the guaranteed bonus. I told her I was asking her to take a voluntary reduction on the bonus, that as far as I was concerned there was serious problems in the department; that she should take responsibility for what had happened over the past year; that the company had millions of dollars invested by her decision making, and we wanted her to take responsibility for the problems in the department.
Mrs. Stow's response to me was that she wanted her money. But then, she also said, And I've done an excellent job, which tied the two things together. And that created a dilemma for me because she did such a terrible job, she had been counseled for two years.
I felt if it was a question of the money and her wanting the money and wanting me to consider that, that would be one thing. But for her to tie it to the fact that she did an excellent job, to me was just an absolute refusal to acknowledge any deficiencies in her department, any problems with the department.
Even the opportunity that I was giving her to straighten the problems out, all of these things were basically ignored. And at that point I made the decision right then that I could not buy those two things together, to give her the full amount of money and to let her continue on doing an excellent job, which to me was the exact opposite of what was going on.
And at that point I said to her, I'll give you the money if you want the money, but I have to make a decision about the future of this company and I'm not going to let you do it unless you acknowledge the problems in your department. Tell everybody  I mean, to tell me and to tell the other people that there were serious problems, that was the only way we could really go on with the relationship.
Q. [By Mr. Fortune] Mr. Setzer, what you told Mrs. Stow when you handed her the check was she could have her full bonus but she wouldn't be able to continue on with the company; isn't that correct?
A. No, that's not what I just said.
Q. All right. Let me 
A. What I said was 
Q. Mr. Setzer.
A.  she made a package deal out of it. She wanted her money and she wanted to continue on to do the same job she had done in the past.
And that was unacceptable. It created a dilemma for me. I made the decision to bring her to a point where she had to accept responsibility to continue on in this job or I would pay her the money and discharge her.
Setzer further testified that as of the time of the March 1987 meeting, he felt that Mrs. Stow's bonus was tied to her performance of the year before. During the course of these proceedings, National has long since recognized that such a view was contrary to the BCP, and that had National steadfastly refused to pay Mrs. *1382 Stow an amount equal to her previous year's bonus, such refusal would have breached the contract. Stow makes no claim of such a contract breach in this case.
Mrs. Stow testified that she was extremely surprised upon receiving a check for $3,500.00 less than she was owed. She reminded Setzer that the BCP required payment in the same amount as she received the year before. At that, Setzer became angry and told her that the contract was "not for you," and was "for IRS purposes only." When she signed the BCP, Mrs. Stow was under the impression that it was for her benefit and was in the nature of a reward for being a good and trustworthy employee.
According to Stow, she asked Setzer what would happen if she insisted upon full payment, and Setzer replied that she could have her money but she would no longer have a job with National. Mrs. Stow admitted that inventory in her product line had run high, but contended she was doing her best to do a good job for the company.
The bonus payment was left unresolved after the March meeting. National does not dispute that Setzer did not, at that time, pay Mrs. Stow her bonus.
On April 2, 1987, Mrs. Stow decided she would tolerate no reduction in her earned bonus "because the contract said that I was supposed to have the total amount. It was the principle." Setzer indicated, through his personnel director, that Mrs. Stow could pick up her bonus, but she would be immediately fired because of poor job performance. Without dispute, Stow received the full amount of her last bonus.
In her suit against National, Stow alleged that National encouraged her to sign the contract (the BCP), which purported to guarantee her a certain minimum amount of annual compensation, provided only that she remain employed with National until December 31 of each year. She further alleged that National falsely assured her that it would abide by the terms of the contract as long as it was in effect, and specifically that pursuant to the contract, the bonus was to be paid without any subjective evaluation of the quality of Stow's job performance. Further, according to the allegations of the complaint, National's false assurances were made in 1982 as an inducement to encourage Stow to sign and rely upon the contract, and "thereby forego alternate employment with defendant's customers or competitors." According to Stow's complaint, however, National, contrary to its verbal and written assurances, "actually harbored an intent to breach the contract at its leisure." Finally, National's decision in 1987 to view the bonus in light of job performance, rather than unconditionally paying her the bonus due, caused the fraud to ripen into monetary damages to Stow.
Upon this background of pleadings and proof, we conclude that the trial judge properly directed a verdict in favor of appellee.
Relief for fraudulent misrepresentation may be granted only when the following elements appear: 1) a false statement concerning a specific material fact; 2) the representor's knowledge that the representation is false; 3) an intention that the representation induce another to act on it; and 4) consequent injury by the party acting in reliance upon the representation. Johnson v. Davis, 480 So.2d 625 (Fla. 1985). A promise as to future conduct may serve as a predicate for a claim of fraud if such promise is made without any intention of performing, or with the positive intention not to perform. Palmer v. Santa Fe Healthcare Systems Inc., 582 So.2d 1234 (Fla. 1st DCA), rev. denied, 593 So.2d 1052 (Fla. 1991). One's status as an employee terminable at will will not, in and of itself, relieve from liability an employer whose independent wrongful act caused the employee to lose a position of gainful employment. Mays v. Stratton, 183 So.2d 43, 45 (Fla. 1st DCA), cert. denied, 188 So.2d 817 (Fla. 1966).
Stow argues that her terminable at will employment status is irrelevant to the consideration of her fraud complaint, citing Food Fair, Inc. v. Anderson, 382 So.2d 150 (Fla. 5th DCA 1980), and Hamlen v. Fairchild Industries, Inc., 413 So.2d 800 (Fla. *1383 1st DCA 1982). These cases are, however, readily distinguishable from the present factual situation. In Anderson an employee was induced to make a false statement, upon a representation that such statement would not be used against her, and then was fired based upon the contents of the statement. In Hamlen an employee alleged that the defendant fraudulently induced him to terminate his employment with another employer, by a promise of permanent employment, and further that the defendant had no intention of honoring such promise, and in fact fired plaintiff very shortly thereafter. Thus, in each of these cases, the defendant employer made a definitive representation to the employee, thus inducing the employee to act in a particular way, which action, in and of itself, resulted in damages to the employee. In Mrs. Stow's case, however, the sole result of her inducement to sign the BCP was that she became entitled to yearly payment of her bonus. She has made no showing whatsoever that the execution of the contract, no matter how such action on her part was induced by National, was in any way detrimental to her. Although she has skillfully argued that she would not have signed the BCP in 1982 had she known (1) that the plan was solely for the company's benefit, and (2) that the company might at some point attempt to negotiate with her concerning the amount of her bonus entitlement, such arguments do not rescue her claim.
Stow's claim that the company had no intention in 1982 of being bound to its obligations under the plan is of no aid to her. This is necessarily so because, quite simply said, the company has in fact abided by the contract. Nothing in the contract purports to provide Mrs. Stow or other employees with both a bonus and a promise of perpetual employment. Thus, Stow's claim that she relied on a promise never meant to be kept rings somewhat hollow, in light of the fact that National has not violated its obligation.
Stow argues that National's failure to disclose to her in 1982 its true reasons for implementing the BCP supports her claim of fraud. The issue, however, in a fraud case, is not whether the party charged with misrepresentation misstated its motivation, but whether such party in fact made a false representation. American International Land Corp. v. Hanna, 323 So.2d 567 (Fla. 1975). National's nondisclosure of beneficial tax consequences by virtue of the BCP does not constitute fraud because it was not a false statement of a material fact. It defies logic to suggest that had Mrs. Stow merely known that her employer would receive a benefit from the BCP, she would not have signed it. Indeed, Mrs. Stow testified that at the time she signed the BCP, she didn't really care whether it benefited the company or not.
Very keenly aware that she does not stand to gain at all from a claim of breach of contract, Mrs. Stow has astutely framed her complaint and proof in the vernacular of fraud. In effect, however, she argues that the jury should have been allowed to infer fraud based upon National's failure initially to perform under the contract by unconditional payment of the 1986 bonus. She concedes implicitly, however, that any such breach of the actual contract was cured. In any event, a mere failure to perform a promise will not predicate a claim of fraud. Century Properties, Inc. v. Machtinger, 448 So.2d 570 (Fla. 2d DCA 1984); Lake Placid Holding Co. v. Paparone, 508 So.2d 372 (Fla. 2d DCA), rev. denied, 515 So.2d 230 (Fla. 1987).
Were we to accede to Stow's position in this case, we would in essence be holding that National's attempt in 1987 to negotiate with Stow concerning the amount of her bonus constituted proof of a fraud committed in 1982, upon execution of the contract. This is necessarily so because of Stow's argument that the "false promise" in this case was National's guarantee of her bonus, which would be nondiscretionary, and not conditioned on performance, payable by March 15. This view is not tenable, regardless of what one may think about Mr. Setzer's methods.
We must accept as a fact Stow's proof that Setzer tried to convince her to "give back" $3,500.00 of her earned bonus in *1384 consequence of her poor job performance. The missing piece here, however, is that she was not in fact actually required to give back the money. Viewed thusly, it becomes clear that Setzer attempted to negotiate with Mrs. Stow. In this negotiation, as in any other, both sides have something to give up and something to gain. National offered to give up its right to terminate Mrs. Stow in return for a monetary concession, and the hope that Mrs. Stow's job performance would improve, thus protecting the investment made by the company in its employee. Mrs. Stow found herself asked to give up a portion of the bonus, which was, figuratively if not literally, in her pocket, in return for an opportunity to redeem herself in the eyes of her employer of 17 years. She elected not to make this bargain, as was her right. Her loss of employment flowed directly from this election, and not from any misrepresentation made by National in 1982 or at any other time.
We note, and have carefully considered, the concern expressed in the dissent that Mrs. Stow believed, based upon statements made to her, "that the consequences of her demanding the company's good faith compliance with its part of the bargain would not include termination of her employment." Our concern is that such construction comes precipitously close to holding that Mrs. Stow had a contract for perpetual employment by virtue of the BCP. The law of Florida at this point imposes no such obligation upon either the employer or the employee. We are simply unable to discern how one can find an actionable wrong in National's decision to terminate Mrs. Stow after she insisted upon full payment of the bonus, while at the same time admitting that National could have lawfully fired her in March of 1987 and delivered her bonus check along with the pink slip.
We are quite mindful that a court reviewing a directed verdict must view the evidence adduced and every conclusion from such evidence in a light most favorable to the nonmoving party, resolving every conflict and inference for that party. Reams v. Vaughn, 435 So.2d 879 (Fla. 5th DCA 1983). Having viewed the evidence in the light most favorable to Mrs. Stow, we are unable to conclude that such evidence permits reasonable inferences supportive of a verdict in her favor. Accordingly, we AFFIRM the trial court's grant of a directed verdict.
SMITH, J., concurs.
SHIVERS, J., dissents w/written opinion.
SHIVERS, Judge, dissenting.
I respectfully submit that, when viewed in the light most favorable to Appellant Stow, as the nonmoving party, the evidence adduced and every conclusion therefrom failed to demonstrate that "no view of the evidence could sustain a verdict for the party moved against." Reams, 435 So.2d at 880. Numerous conflicts arose in the evidence and, for purposes of Appellee's motion for a directed verdict, must be resolved, along with the resulting inferences, in favor of Stow. For that reason, I would reverse the trial court's grant of a directed verdict. D'Angelo v. Jefferson Ward Stores, Inc., 517 So.2d 127 (Fla. 4th DCA 1987); Reams.
As the majority opinion notes, Johnson permits relief for a fraudulent misrepresentation only when four elements are all presented. 480 So.2d at 627. See Taylor v. Kenco Chem. & Mfg. Corp., 465 So.2d 581, 589 (Fla. 1st DCA 1985). At the close of Appellant's evidence, the trial court held that Stow had failed to adduce "any proof whatsoever" to meet the legal requirements of fraud. I believe that holding constitutes reversible error.
The first element of fraud presented in Johnson, "a false statement concerning a material fact," was demonstrated when the Company, Appellee, falsely assured Stow in 1982, when she was invited to sign the BCP, that the amount of her future compensation thereunder was not contingent upon Appellee's subjective assessment of her performance. The terms of the BCP, as set forth in the majority opinion, make no mention of any nexus between Appellee's subjective assessment of the job performance *1385 and the Executive Employee's entitlement to the yearly bonus. Stow alleged that Alan Trager, Appellee's chief financial officer, informed her in 1982 that the Company attached no implied or unwritten conditions to the terms of the BCP. In fact, Trager was questioned at trial concerning whether the BCP entailed any implied conditions:
Q. Mr. Trager, did this plan have any implied conditions such as an employees [sic] performance would have to be acceptable to you or Mr. Setzer or anybody else in order for the employee to be entitled to receive the money guaranteed in the plan?
A. No, it did not. As long as they were employed year-end they were going to get the same bonus they got the prior year. And that was the intent, and that's what they were told. They did have the opportunity to earn more if they did perform well. They would be not only equal, but get a raise over the prior year.
The record of Setzer's subsequent comments to Stow in March 1987, however, evinces an attempt to pay her less than she was owed pursuant to the BCP, and conclusively establishes that Appellee's prior assurances about the nature and effect of the BCP were false. Setzer's testimony shows unequivocally that Appellee's request that Stow accept a "voluntary reduction" in the amount of the bonus was tied to the alleged "deficiencies in her department."
The second element of fraudulent misrepresentation, "the representor's knowledge that the representation is false," is closely linked to the first element. 480 So.2d at 627. Despite Trager's representations to Stow that no implied conditions were attached to the terms of the agreement, Setzer acknowledged at trial that "I guess I felt it was tied to the performance of the year before." Evidence was presented from which the jury reasonably could have concluded that the Company had no intent to be bound by the plain language and terms of the BCP. See Palmer, 582 So.2d at 1236.
The third element of fraudulent misrepresentation is "an intention that the representation induce another to act on it." 480 So.2d at 627. The jury could have concluded that Appellee falsely assured Stow and other participants in the BCP about their entitlement to full future compensation so long as the express terms of the agreement were met, and that Stow was thereby induced to participate in the BCP.
The evidence of the fourth element, "consequent injury by the other party acting in reliance on the representation," was demonstrated by Stow's testimony that she would not have insisted on being paid the money she was owed in March 1987, had it not been for her reliance on the guaranteed full payment purportedly created by the BCP. Stow's termination and her corresponding diminished earning capacity resulted from her reliance on the language in the BCP agreement and on Appellee's false and misleading assurances about the true nature of the BCP.
Appellant conceded in the initial brief that she was an "employee at will." That is, neither Stow nor Appellee was bound to a particular term of employment. The Company maintains that the issues of entitlement to the full bonus and the right to continuing employment with Appellee remained separate and distinct matters. However, I believe that the jury could have concluded that the Company materially and tortiously misled Stow to believe that if she complied with the written prerequisites of the BCP, she would receive a bonus on a date certain, that the amount of the bonus offered would not be reduced, and, significantly, that the consequences of her demanding the Company's good-faith compliance with its part of the bargain would not include termination of her employment. Appellant's status as an at-will employee would not, of itself, dispose of her claim under these facts. See Mays, 183 So.2d at 43. While it is true that Appellee technically met its commitment to pay the full bonus to Stow after she refused to accept a reduced amount, it is disingenuous for the Company to suggest that a participating Executive Employee should have foreseen that a job termination was the price of *1386 entitlement to the full promised amount. Given the facts in the record on review, I find Appellee's position to be untenable. Accordingly, I would reverse the trial court's granting a directed verdict.
On the second issue, I submit that the trial court abused its discretion in the exclusion of relevant evidence that other nonfamily participants in the BCP were not paid what they were owed or otherwise were expecting under the agreement. See Great American Insur. Co. v. Coppedge, 405 So.2d 732, 736 (4th DCA 1981), rev. den., 415 So.2d 1359 (Fla. 1982).