57 F.3d 1065
 10 IER Cases 1312
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Herbert BOGINIS, Plaintiff-Appellant,
v.
MARRIOTT OWNERSHIP RESORTS, INCORPORATED, Defendant-Appellee.
 No. 94-1843.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 6, 1995.
Decided: June 8, 1995.
 
 ARGUED: Timothy Francis Brown, Watt, Tieder & Hoffar, McLean, VA, for appellant.
 Marc Abrams, Portland, OR, for appellee. ON BRIEF: Julienne W. Bramesco, Carlton J. Trosclair, Law Department, Marriott Corporation, Washington, DC, for appellee.
 E.D.Va.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and WILLIAMS, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Plaintiff-appellant Herbert Boginis filed a diversity action in the Eastern District of Virginia alleging that Marriott Ownership Resorts, Incorporated ("MORI"), his former employer, committed fraud in inducing him to accept employment with MORI, violated his contract by firing him without adhering to MORI's own announced procedures, and violated the New Jersey Conscientious Employee Protection Act ("CEPA") by firing him for whistleblowing. Before trial had begun, the district court granted summary judgment for MORI, on the grounds that Boginis had produced insufficient evidence to create a genuine issue of material fact as to any of his claims. Although we express no opinion as to the veracity of the facts sworn to by Boginis in his affidavits, the summary judgment standard requires that the court must assume the credibility of the nonmovant's evidence. Boginis, as nonmovant, has created material disputes of fact as to: (1) whether the procedures used to fire him, which did not comport with MORI's personnel policies, were such that a reasonable employee would believe them to be incorporated into his or her contract; and (2) whether or not Boginis' firing was motivated, in whole or in part, by his whistleblowing. Summary judgment as to Boginis' contract and whistleblowing claims was therefore improper. No genuine dispute of material fact exists as to Boginis' fraudulent inducement claim, however, and therefore summary judgment was proper as to that claim.
 
 FACTS PRESENTED
 
 2
 At the end of 1991, MORI solicited Boginis to work for MORI as Project Director of MORI's resort operation in Barbados. In November of 1991, Boginis flew to MORI's headquarters in Lakeland, Florida, to discuss the potential position. Boginis and a MORI executive then flew to MORI's resort in Barbados, where they stayed for three days and two nights, during which time Boginis examined the project. Boginis met with the General Manager of the hotel at the resort, Peter Valenzuela, and other Barbados staff. Boginis also looked at housing near the project, and was made aware that he would have to find housing of his own if he was offered and accepted the job.
 
 
 3
 MORI extended a formal job offer to Boginis in early December, and Boginis started working for MORI at the Lakeland office in Florida on December 12, 1991. He began work while still negotiating his employment contract, and finally signed the contract in early 1992. Although the contract did not specify the duration of his employment, Boginis understood that his employment was at will.
 
 
 4
 In February of 1992, Boginis assumed his duties in Barbados. He alleges that conditions there were not as MORI had previously represented, and that MORI had failed to disclose various material facts about the project. In September of 1992, after seven months in Barbados, Boginis requested and received a transfer to a new position in New Jersey. Boginis signed a written modification of his employment agreement which changed his salary and incorporated MORI standard operating procedures by reference.
 
 
 5
 In December of 1992, Joseph Cervasio, who was the MORI Project Manager for New Jersey, told Boginis to evaluate a member of his staff, Bill Crim, for suitability as a sales manager. Boginis responded that Crim's lack of a New Jersey real estate license disqualified Crim from the position under New Jersey law. Boginis did not contact any governmental authority, such as the New Jersey Real Estate Commission. Cervasio argued with Boginis about Crim on March 19, 1993, and Cervasio told Boginis that he was recommending Boginis' termination. Boginis claims that Cervasio terminated him in retaliation for telling Cervasio that it would be illegal to promote Crim without a license. Cervasio states that Boginis' termination was due to restructuring and downsizing of the New Jersey project.
 
 
 6
 MORI has produced some evidence that during early 1993, it was laying off personnel at the New Jersey site. Sales and marketing staff had been reduced by one-third between June of 1992 and March of 1993, and Boginis had evaluated a large number of personnel for potential termination. However, Boginis states that there was no discussion of any elimination of sales management positions prior to Boginis' argument with Cervasio about Bill Crim on March 19, 1993. To the contrary, MORI was at that time actively seeking to hire another sales manager, because Cervasio and Boginis had agreed on the need for additional sales management staff in order to create a new sales program.
 
 
 7
 After informing Boginis that he intended to fire him, Cervasio immediately called Nancy Callahan, a member of MORI's human resources department, and asked about MORI's discipline procedures. Callahan advised Cervasio that, as specified in MORI's written policies, Cervasio was required to issue two written warnings and counseling before terminating an employee. According to MORI's Director of Human Resources, MORI's termination policy applies to all employees, including managers, and is addressed during employee orientation and included in MORI's employee handbook. MORI has a formal policy that terminations not in compliance with the requirements for progressive discipline are reversed by the Human Resources Department. Boginis' prior termination of a sales executive had been reversed by Human Resources for failure to comply with the policy. Cervasio admitted at his deposition that Boginis should not have been fired without at least two written warnings, but that the warnings were never given.
 
 
 8
 Subsequent to his termination, Boginis filed suit in the United States District Court for the Eastern District of Virginia, Alexandria Division. He alleged four different causes of action: misrepresentation (fraud) based upon oral statements made and information not disclosed at the time he was interviewing for the job in Barbados (Count I); breach of contract (Count II); breach of contract based upon a claimed "implied contract term" that he could not be terminated without standard personnel procedures (Count III); and a violation of CEPA in that Boginis' termination was in retaliation for complaining that Bill Crim needed a real estate license (Count IV).
 
 
 9
 After discovery was taken, MORI moved for summary judgment. Boginis voluntarily dismissed Count II of his complaint. On May 26, 1994, the district judge, after a hearing on the motion, granted summary judgment on the remaining causes of action. The instant appeal then ensued.
 
 DISCUSSION
 
 10
 We review the granting of a motion for summary judgment de novo, see, e.g., Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990), cert. denied, 498 U.S. 1109 (1991), applying the same standard as did the district court: We must determine whether a genuine issue of material fact exists to be tried by a jury. See, e.g., Fed.R.Civ.P. 56(c); Celotex v. Catrett, 477 U.S. 317, 322 (1986). While "[g]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice," Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985),"materiality" means that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In assessing "genuineness" and "materiality," the nonmovant is entitled to have the credibility of his evidence assumed, and all reasonable inferences of fact drawn in his favor. See, e.g., Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979).
 
 
 11
 I. Misrepresentation and Failure to Disclose in the Inducement.
 
 
 12
 District courts sitting in diversity actions must apply the choice of law rule of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 80 (1938). In an action for tortious conduct, such as fraud in the inducement, Virginia applies the doctrine of lex loci delecti and selects the law of the site of tortious activity. See Ryder Truck Rental, Inc. v. UTF Carriers, Inc., 790 F.Supp. 637, 641 (W.D.Va.1992). Boginis' initial employment contract with MORI was formed and signed in Florida, and the parties and the district court have agreed that Florida law should govern Boginis' claim of fraudulent misrepresentation and nondisclosure in the inducement of Boginis to sign the contract.
 
 
 13
 The contract Boginis signed contained an integration clause stating that it "sets forth the entire agreement between the parties." In finding that Boginis could not state a claim for fraud or failure to disclose, it is unclear whether the district court found that the integration clause prevented Boginis from introducing extrinsic, parole evidence as to the statements allegedly made and the information not disclosed. Under Florida law, however, "[w]hile final agreements may not be contradicted by parole or extrinsic evidence, an exception is made in actions alleging negligent misrepresentation or, otherwise, fraud in the inducement. In such cases, the parole evidence rule does not preclude admission of extrinsic evidence." Baggett v. Electricians Local 915 Credit Union, 620 So.2d 784, 785-86 (Fla. Dist. Ct.App.1993); accord, Palmer v. Santa Fe Healthcare Sys., Inc., 582 So.2d 1234, 1235 (Fla. Dist. Ct.App.), cert. denied, 593 So.2d 1052 (Fla.1991).[1] Thus, the merits of each allegedly fraudulent misrepresentation and each alleged failure to disclose must be examined, under the summary judgment standard, in light of the evidence thus far produced by the parties.
 
 
 14
 A. Fraudulent or Negligent Misrepresentation.
 
 
 15
 Under Florida law, relief for fraudulent or negligent misrepresentation may be granted only when all of the following elements are shown: (1) a false statement of material fact; (2) proof that the representor knew or should have known that the representation was false; (3) an intention that the representation induce another to rely on it; and (4) consequent injury to the party acting in reliance on the representation. E.g., Johnson v. Davis, 480 So.2d 625, 627 (Fla.1985); Stow v. Nat'l Merchandise Co., Inc., 610 So.2d 1378, 1382 (Fla. Dist. Ct.App.1992); Baggett, 620 So.2d at 786. Generally speaking, a nonspecific statement of opinion such as occurs in "puffing," cannot form the basis for a fraud action, because the listener is not expected to rely on the statement. Savic v. Grand Bahama Dev. Co., Ltd., 701 F.2d 879, 883 (11th Cir.1983). Typically, a prediction of future events alone also cannot be a basis for fraud, because it is not a representation that is false when made. See id. However, under Florida law, a promise of future conduct can be a predicate to a fraud claim when the promise is made either without the intention to perform, or with the positive intention not to perform. E.g., Stow, 610 So.2d at 1382; Palmer, 582 So.2d at 1236.
 
 
 16
 Boginis claims that MORI made to him several fraudulent or negligent misrepresentations about the Barbados project: (1) that the project's occupancy rate would average 85 percent with a 98 percent peak; (2) that the project had the highest Honored Guest award redemption rate in the Marriott system; (3) that trained personnel would be available to work at the project; (4) that MORI intended to construct "first-rate" units; (5) that MORI intended to develop other Caribbean projects; and (6) that MORI intended to convert the entire resort into time-share units. Boginis' sworn statement claims that he would not have signed the contract if he had known that the statements were false.
 
 
 17
 However, as to each of the alleged misrepresentations, Boginis has failed to produce evidence as to at least one of the elements of a fraudulent misrepresentation claim. As to the occupancy rate, neither the 98 percent peak nor the projection of an 85 percent average rate were false statements of fact or of present intention. Although the average in the past may have been somewhat lower, a projection is an estimate of future events--it is not a promise of existing fact or a statement of intent, because MORI has no control over what the precise occupancy percentage will be. As to the Honored Guest rate, Boginis has submitted no evidence that the hotel did not have the highest Honored Guest occupancy rate in the system; he submitted no evidence of what the rate was at the Barbados hotel or at other MORI hotels. Likewise, regarding the trained staff, Boginis has not produced evidence that "trained" personnel were not "available" to him, and has not defined what MORI meant by "trained" when MORI made the representation. Similarly, Boginis has admitted that MORI was in the process of developing various Caribbean projects, and so the statement by MORI that it intended to develop such projects was not false.
 
 
 18
 Boginis claims that MORI told him, during the late 1991 negotiations, that the project would be converted to a "first rate" hotel.
 
 
 19
 Boginis claims that MORI actually used low budget surplus furnishings rather than the high quality furnishings typically used by MORI in its hotels, and submitted as evidence of MORI's intentions an April, 1992 document showing that MORI intended, due to budgetary constraints, not to do a first rate conversion. However, Boginis has presented no evidence to show that MORI did not intend the conversion to be "first rate" when MORI told him so in late 1991; he has shown only that by April of 1992, MORI did not intend it to be first rate. A party that honestly represents its intentions has not committed fraud, even if its plans end up changing. Under Florida law, a promise of future conduct can be a predicate to a fraud claim only when the promise is made either without the intention to perform, or with the positive intention not to perform. E.g., Stow, 610 So.2d at 1382; Palmer, 582 So.2d at 1236. Boginis has presented no evidence that MORI did not intend the conversion to be "first-rate" when MORI told him of its intentions in 1991. Therefore none of the statements has been shown to be false, and none can form the basis of a claim for misrepresentation.
 
 
 20
 Boginis claims that MORI told him the units would eventually be 100 percent converted to time-share units, and that he would not have taken the job if he had known that the units would not be so converted. Boginis has submitted a MORI report which shows that MORI intended to convert only 31 percent of the hotel rooms. However, Boginis has not shown that MORI intended for him to rely on its intention to convert all of the units, because he has not shown that MORI would have reason to think he would find his position as Project Director any less desirable with fewer units converted. Therefore, he has not shown an intention by MORI that he rely on the allegedly false statement, and therefore it cannot serve as the basis of a misrepresentation claim.
 
 
 21
 B. Fraudulent Non-Disclosure.
 
 
 22
 Florida recognizes actions for non-disclosure of information, or "fraudulent concealment," between two parties in privity when: (1) one party deliberately and in order to deceive withholds material facts from the other; (2) the withholder has superior knowledge concerning the matters represented, or acts as a fiduciary, or tricks the other party to prevent that party from performing an independent investigation; and (3) the other party lacks an equal opportunity to discover the facts. E.g., Hauben v. Harmon, 605 F.2d 920, 924 (5th Cir.1979); Taylor v. Am. Honda Motor Co., Inc., 555 F.Supp. 59, 64 (M.D. Fla.1982).
 
 
 23
 Boginis claims the following facts were material and not disclosed by MORI, despite its duty to do so: lack of housing near the project, crime and labor strife near the project, and a commitment by MORI to limit employment of American nationals. However, the uncontradicted evidence submitted by the parties shows that the labor strife and crime problems did not occur until after Boginis had begun working at the Barbados project. Thus, MORI could not possibly have had superior knowledge of the facts during the contract negotiations which all occurred several months prior to the strife and crime, and cannot have committed fraud by not disclosing them. The uncontradicted evidence also shows that during the contract negotiations, MORI offered to show Boginis housing in Barbados, and Boginis understood that he would have to find his own housing. Thus, Boginis had an equal opportunity to discover the facts surrounding the existence of housing, and the fact that he would have to find housing himself was disclosed, thereby vitiating any fraud claim. The uncontradicted evidence shows that Boginis did hire a staff of some Americans and some non-Americans. Thus, Boginis has not shown that the alleged commitment not to hire Americans was a material fact, and its non-disclosure cannot be actionable fraud.
 
 
 24
 C. Conclusion.
 
 
 25
 Because Boginis has failed to produce sufficient evidence from which a reasonable jury could find that MORI fraudulently or negligently misrepresented facts, or breached a duty to disclose certain facts, we affirm summary judgment as to Boginis' fraudulent inducement claim.
 
 
 26
 II. Firing Procedures.
 
 
 27
 As noted above, district courts sitting in diversity actions must apply the choice of law rules of the forum state. Klaxon Co., 313 U.S. at 496; Erie, 304 U.S. at 80. When a cause of action is contractual in nature, Virginia choice of law rules generally require the contract to be governed by the law of the place where the contract was made. E.g., Ryder Truck Rental, 790 F.Supp. at 641. However, if the contract is made in one state but is to be performed in a different state, the governing law is the place of performance. E.g., Ryder, 790 F.Supp. at 642; Sneed v. Am. Bank Stationary Co., 764 F.Supp. 65, 67 (W.D.Va.1991). An exception exists if the contract is to be performed approximately equally among two or more states, in which case the law of the state in which the contract was formed should apply. Ryder, 790 F.Supp. at 642; Roberts v. Aetna Casualty & Sur. Co., 687 F.Supp. 239, 241 (W.D.Va.1988).
 
 
 28
 Boginis' claim that he was entitled in his termination to the standard operating procedures contained in MORI's personnel policy statements is a claim sounding in contract. See Woolley v. Hoffman-Laroche, Inc., 99 N.J. 284, 491 A.2d 1257, passim (1985) (analyzing claim under principles of contract). When Boginis and MORI executed the modifications of Boginis' employment contract for the New Jersey position, both parties intended that the contract would be performed in New Jersey. Therefore, New Jersey law controls.
 
 
 29
 In 1985, the New Jersey Supreme Court decided the seminal case of Woolley v. Hoffman-LaRoche, Inc, 491 A.2d 1257. The facts of that case were as follows: An employer had a policy manual which was widely disseminated to employees at all levels and which provided that certain job termination procedures would be used for firing employees. An employee who, like most employees of the employer, had no individual employment contract, was fired without use of the procedures. The New Jersey Supreme Court held that the employer may have violated an implied contract created by the policy manual when it failed to use the procedures, and remanded for a determination as to whether the reasonable expectation of employees was that the termination policies in the manual would be followed. 491 A.2d at 1264. The court explained:
 
 
 30
 [W]hen an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary, instead of "grudgingly" conceding enforceability of those provisions, should construe them in accordance with the reasonable expectations of the employees.
 
 
 31
 Id. (citation omitted). According to Woolley, the meaning of such a manual must be determined by considering "the probable context in which it was disseminated and the environment surrounding its continued existence." Id. at 1265. The Woolley court concluded that provisions of an employer manual concerning job security "shall be considered binding unless the manual elsewhere prominently and unmistakably indicates that those provisions shall not be binding or unless there is some other similar proof of the employer's intent not to be bound." Id. at 1270.
 
 
 32
 In Ware v. Prudential Insurance Co., 220 N.J.Super. 135, 531 A.2d 757, 760 (1987), cert. denied, 113 N.J. 335, 550 A.2d 450 (1988), a New Jersey court found that Woolley did not extend to a case in which the employee had an individual employment contract which explicitly stated that the employee was employed "at will" and which contained an integration clause. The New Jersey court in Ware found that the reasonable expectation of the management employee who had been fired without the process described in the employer's policy manual, was that the manual would not apply to his position, but rather to non-management employees only. 531 A.2d at 760. On the other hand, in Preston v. Claridge Hotel & Casino, 231 N.J.Super. 81, 555 A.2d 12, 15 (1989), a New Jersey court found that an employer's dissemination of a statement that it was not contractually bound by its policies was not sufficient to constitute that type of "clear and unmistakable" indication that the provisions of the handbook would not be binding as required by Woolley . The Preston opinion stated that in order to disclaim a "good cause" termination requirement in the employee handbook, the employer must state in a prominent disclaimer that "the employer continues to have the absolute power to fire anyone with or without good cause." 555 A.2d at 15-16.
 
 
 33
 The instant case appears to fall between Ware and Preston. Viewing the facts in accordance with the summary judgment standard, Boginis has shown that he was not fired as part of a layoff.[2] He has shown that MORI fired him without adhering to the procedures outlined in their written and widely-disseminated policy handbook, as testified to by MORI's Human Resources employee (Callahan) and as admitted to by Cervasio, who actually fired Boginis. Callahan stated that the policy applied to managers, and Cervasio stated that it applied specifically to Boginis. However, Boginis' written individual contract does not contain any statement in regards to firing procedures, yet contains an integration clause similar to the clause in Ware. Thus the question presented is whether an individual employment contract which does not refer to firing policies but contains an integration clause meets the Woolley exception as "some other similar proof of the employer's intent not to be bound," 491 A.2d at 1270.
 
 
 34
 There is conflicting evidence as to whether the integration clause in Boginis' contract was the type of employer disclaimer which a reasonable employee would understand to demonstrate MORI's intent not to be bound by its personnel policies. Boginis admitted that when he initially read the contract and the integration clause, which contract was modified for his New Jersey position to include any changes in "standard operating procedures," he understood himself to be hired as an at-will employee. Only later, when he himself was required to follow the personnel procedures in order to fire employees, did he come to discover the policy. Cervasio and Callahan, however, admitted that MORI had a duty to follow the personnel policies, indicating that MORI had not disclaimed the procedures as to Boginis. In light of the conflicting evidence of the employer's intent and the employee's reasonable expectations here, the issue should be sent to a jury. As noted by a New Jersey court in Shebar v. Sanyo Business Systems Corp.,
 
 
 35
 We conclude that the thrust of the Woolley holding and the rationale, as well as the public policy on which it is based, is directed to the existence of an employer's general policy rather than the form in which it is expressed. The difference between a manual or handbook policy and a policy otherwise expressed presents, in our view, an issue of proof rather than of substance.
 
 
 36
 218 N.J.Super. 111, 526 A.2d 1144, 1148-49 (1989), aff'd 111 N.J. 276, 544 A.2d 377 (1988). Just as the issue of whether a policy is disseminated such that a reasonable employee would view it as binding is an issue for the jury, the issue of whether a disclaimer, in whatever form it might be, demonstrates to reasonable employees the employer's intent not to be bound, is an issue for the jury. See Preston, 555 A.2d at 15 (noting that it is within the province of the jury to determine whether the employer had clearly indicated that it would not be bound by employee handbook provisions). Thus, we reverse summary judgment as to Boginis' claim of contractual breach by failure to follow personnel procedures, and remand for trial.
 
 
 37
 III. New Jersey Comprehensive Employee Protection Act.
 
 
 38
 As noted above, district courts sitting in diversity actions must apply the choice of law provisions of the forum state. Klaxon Co., 313 U.S. at 496; Erie, 304 U.S. at 80. When the cause of action is one for tortious conduct, Virginia applies the law of the site of tortious activity. Ryder, 790 F.Supp. at 641. Boginis' claim of wrongful termination under CEPA is a claim of tortious wrongful termination, and is therefore governed by the law of New Jersey.
 
 CEPA reads in pertinent part as follows:
 
 39
 An employer shall not take any retaliatory action against an employee because the employee does any of the following:
 
 
 40
 a. Discloses ... to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law ...
 
 
 41
 ...
 
 
 42
 c. Objects to ... any activity, policy or practice which the employee reasonably believes ... is in violation of a law, or a rule or regulation promulgated pursuant to law....
 
 
 43
 N.J. Stat. 34:19-3.
 
 
 44
 It is not disputed that Boginis complained to Cervasio that Crim did not have a real estate license, in the good faith belief that Crim's conduct violated New Jersey law. It is not disputed that Cervasio was a supervisor, and that Cervasio asked Crim to obtain a license. It is not disputed that Cervasio, by employing Crim without his obtaining a license, might have been an accomplice in Crim's violation. It is disputed whether MORI fired Boginis because of Boginis' objection to Crim's employment without a license.
 
 
 45
 Under a literal reading of the statute, if Boginis was fired for his actions, he should be protected by the statute. Boginis complained to a "supervisor" about conduct Boginis reasonably believed violated the law. Boginis complained not to Crim, but rather to Crim's supervisor, Cervasio. Because the statutory language is clear, we need go no further in examining the policies behind the statute.
 
 
 46
 The district court ruled that under New Jersey law, CEPA did not apply because objections about illegality to someone who is involved in the illegality are "not the type of statements contemplated by the statute." The New Jersey Supreme Court has previously rejected the same argument. See Abbamont v. Piscataway Township Bd. of Educ., 138 N.J. 405, 650 A.2d 958, 963 (1994) (affirming appellate court's reversal of trial court's ruling that a CEPA plaintiff is required to make his disclosure to someone other than a supervisor responsible for remedying the wrongdoing).
 
 
 47
 The district court further found that Boginis' claim could not survive summary judgment because he had not shown sufficient evidence that he was fired in retaliation for his complaints, rather than as part of MORI's alleged downsizing or for "insubordination." Boginis has produced evidence that Cervasio told Boginis that he intended to fire him the same day Boginis and Cervasio argued about Crim. Boginis has also produced evidence that Cervasio's claimed reason for firing Boginis, that MORI was downsizing the New Jersey operation, was false; Boginis claims that the New Jersey office was looking to hire another sales manager at the same time he was fired. Enough was shown by Boginis to survive summary judgment, in that, if a reasonable jury concludes that MORI's "downsizing" claim was false, a reasonable jury might further conclude that the falsity was intended to cover up firing Boginis for whistleblowing. We therefore remand Boginis' CEPA claim for trial.
 
 CONCLUSION
 
 48
 Although summary judgment was properly entered against Boginis on the fraudulent inducement claim, summary judgment was entered prematurely on the contract and whistleblowing claims. Although Boginis' representations about the facts may not be accurate, credibility is for the jury to decide, not the district court and not the court of appeals.
 
 
 49
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 
 [1]
 MORI also claims in its brief that Boginis' misrepresentation and non-disclosure claims, both sounding in tort, should fail because he has no claim based on his contract for those claims. However, the case cited by MORI for this novel proposition, Ostman v. Lawn, 305 So.2d 871 (Fla. Dist. Ct.App.1974), is inapposite, as that case involved facts which never ended in a consummated contract, and thus the plaintiff in that case had not been fraudulently induced to sign a contract at all. Rather, Florida courts have recognized the torts of fraud and non-disclosure in the inducement independently of any contractual claim. See, e.g., O'Rear v. American Family Life Assurance Co., 784 F.Supp. 1561, 1562 (M.D. Fla.1992); Telesphere Int'l, Inc. v. Scollin, 489 So.2d 1152, 1154-55 (Fla. Dist. Ct.App.1986)
 
 
 [2]
 If he had been fired as part of a layoff or downsizing, presumably the policies in the handbook would not apply. See Linn v. Beneficial Commercial Corp., 226 N.J.Super. 74, 543 A.2d 954, 955 (1988)