764 So.2d 677 (2000)
CONNECTICUT GENERAL LIFE INSURANCE COMPANY and Cigna Financial Advisors, Inc., Appellants,
v.
Roy L. JONES, Appellee.
No. 1D98-2424.
District Court of Appeal of Florida, First District.
June 1, 2000.
Rehearing Denied August 16, 2000.
*678 Arthur J. England, Jr. and Brenda K. Supple of Greenberg, Traurig, P.A., Miami, for appellants.
Terrance E. Schmidt of Bledsoe, Schmidt, Lippes, & Moonly, P.A., Jacksonville; Michael J. Korn of Korn & Zehmer, Jacksonville, for appellee.
WOLF, J.
This is an appeal from a final judgment awarding the appellee, Roy L. Jones, compensatory and punitive damages on his claims against appellants for implied contract/unjust enrichment, fraud in the inducement, and a violation of the Americans with Disabilities Act (ADA). Appellants raise seven issues and 15 sub-issues on appeal. We conclude that only two issues require reversal. First, we determine that the jury's verdict in favor of Jones on the fraud claim was not supported by the evidence. We also accept Jones' concession that the trial court's calculation of the amount of prejudgment interest on the compensatory damage award was in error, and reverse for further proceedings on the issue of prejudgment interest. With respect to all other issues raised in this appeal, we affirm.
This case arises out of work Jones did between August 2, 1990, and December 22, 1994, while he was totally physically disabled, which financially benefitted appellants and for which Jones did not get paid.
In May 1988, Jones became the district sales manager over appellants' Jacksonville and Orlando offices. Jones' duties as a district sales manager for the Jacksonville and Orlando offices included assisting the salesmen (known as producers) in the two offices with analyzing their clients' financial statements and circumstances and designing and constructing financial and estate plans, as well as assisting and supervising the producers in preparing sales presentations to their clients. Jones' duties as a district sales manager for the two offices also included managerial functions such as recruiting, hiring, training, and managing new producers and office personnel, and performing general administrative functions.[1] Jones' 1990 compensation package for his position as district sales manager for the two offices included *679 no base salary and consisted entirely of 15% of first revenues generated by the offices from all product lines in 1990, 12% of all renewal revenues generated by the offices in 1990, and a $5,000 bonus if the offices proved profitable in 1990.
On August 2, 1990, Jones injured his back. He immediately went on short-term disability leave and began receiving benefits under appellants' short-term disability income benefits plan. Appellants granted Jones' request for long-term disability benefits under their long-term disability income benefits plan in January 1991, and Jones has received such benefits since that time.
Between the time of his injury and December 22, 1994, Jones worked from his home with the producers in the Jacksonville and Orlando offices in analyzing clients' financial statements and circumstances, designing and constructing financial and estate plans, and assisting the producers in preparing sales presentations for their clients. Jones received no compensation from appellants for any of the work he performed with or for the producers between August 2, 1990, and December 22, 1994.
Jones presented evidence at trial that in October 1990 he and James Stanger, appellants' regional vice president for the North Florida Region at the time, had a telephone conversation in which the subject of compensation for Jones for the work he had been doing with the producers from his home came up. Jones testified that he made the following statement to Stanger during that conversation: "[P]ay me for the work that I'm doing for the producers from this point forward and for what I've done since I've been out, or I'm not going to work for them anymore." Jones testified that Stanger stated in response to this statement, "Well, I'll get back to you in a few days." Jones testified that when Stanger called back a few days later he stated: "Okay, just continue to work with the producers like you have been and do what you can, do as much as you can. I'll pay you when you get back."
Jones also presented evidence at trial that Russell Duade, appellants' senior vice president and Stanger's immediate supervisor, knew of Jones' injury and absence from full-time office work as early as October 1990. Testimony from both Duade and Jones, presented during Jones' case, established that Duade personally visited Jones at Jones' apartment in Jacksonville in December 1990 to discuss Jones' disability. Jones described the substance of this meeting in his testimony as follows:
A: There was a lot of discussion about my back....We talked about the office, the business, where it stood. And he said, you know, I just want to thank you for what you're doing for the producers, and I don't know how anybody can do that and would do what you've done for those producers. I said, Russ, my thanks is going to be the compensation that I receive for the work that I do.
Q: At that point, did you have confidence that you could rely on what Mr. Duade was telling you?
A: I did.
Jones testified that he had further conversations with Stanger in the beginning of 1991 in which he demanded compensation for the work he had already done with the producers and the work he was continuing to do with the producers. Jones testified that although Stanger at first suggested that paying Jones might jeopardize Jones' disability benefits, Stanger later stated: "I've discussed it with Russ, and we'd like for you to wait until you come back. You'll get paid then. You'll get your full disability." Jones testified that his understanding of the deal following these conversations with Stanger was that he was to keep working with the producers, would continue receiving his disability payments, and would be paid in a lump sum when he came back to work. Jones testified that he agreed to this arrangement because he *680 did not, at the time, expect to be on disability leave very long.
Jones presented testimony during his case that Stanger had told his replacement, Tom Slack, that Jones "was doing case design work for the producers in Jacksonville and Orlando" and that "an arrangement was in place for [Jones] to receive funds for his involvement with [the producers]." Slack testified that he had not been advised by Stanger of the specifics of the compensation arrangement worked out with Jones.
Jones testified that in December 1991, he again met with Duade at his (Jones') home in Jacksonville. Jones testified that during that meeting, in response to another inquiry by Jones about compensation, Duade said,
Don't worry about it. You're going to get paid.... As long as I have any say so about it, you will forever have a position with this company.
Jones testified that he believed at the time that Duade would live up to this assurance. While both Stanger and Duade acknowledged during their testimony that certain conversations between them and Jones had taken place concerning compensation for the work Jones had been doing with the producers during his disability, both Stanger and Duade denied in their testimony that any promises regarding Jones being paid for that work were ever made.
In 1994, appellants offered Jones various compensation packages for the work he had done for the companies since he had become disabled. Jones did not accept any of these offers and ceased working with the producers in Jacksonville and Orlando on December 22, 1994. Jones presented evidence at trial which showed that, if his 1990 compensation formula had been applied to the revenues generated by the Jacksonville and Orlando offices during the period from August 1990 through December 1994, with a deduction being taken for a salary being paid to an individual hired to perform the non-essential administrative functions Jones could not perform during that period, he would have earned substantially more than what he had been offered by appellants in their 1994 compensation proposals. Jones also presented testimony from his psychologist which showed that he had psychological problems that were at least in part attributable to his tenuous and uncertain employment relationship with appellants over the years.
The jury returned liability verdicts on all claims in favor of Jones, with damages awarded on the implied contract/unjust enrichment claim separate from the damages awarded on the fraud claim. After the jury returned its liability verdict, the parties began proceedings addressed solely to Jones' claim for punitive damages in connection with the fraud claim. Following the presentation of evidence on the issue of punitive damages, the jury deliberated and returned a verdict assessing punitive damages against Connecticut General Life Insurance Company in the amount of $3 million and assessing punitive damages against Cigna Financial Advisors in the amount of $2 million.
The trial court subsequently entered an order which concluded, among other things, that the compensatory damage awards should be reduced in order to avoid duplicative recovery. The trial court then entered a final judgment which awarded Jones, among other things, $400,000 for non-duplicative implied contract, ADA back pay and fraud damages through December 31, 1994; prejudgment interest; and $5 million in punitive damages assessed against appellants in accordance with the jury's punitive damages verdict.
Some confusion exists as to whether a party may sue to recover damages for both breach of contract and fraud in the inducement based upon the same representations, as well as the level of proof necessary to support any independent action for fraud in such circumstances. In HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238 (Fla.1996), the supreme court held that a claim for fraud *681 in the inducement constituted a tort independent from any underlying claim for breach of contract and that, therefore, a fraud claim in such circumstances was not barred by the economic loss rule. The supreme court, however, did not discuss in HTP the nature of the misrepresentation made in that case which supported the fraud claim.
In Moransais v. Heathman, 744 So.2d 973 (Fla.1999), the supreme court discussed their decision in HTP as follows:
In HTP, Ltd., we held that a claim for fraudulent inducement constituted a tort independent from the underlying contract and, therefore, was not barred by the economic loss rule. We also noted:
The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract.

Id. at 981 (emphasis added).
In Williams v. Peak Resorts Int'l, Inc., 676 So.2d 513 (Fla. 5th DCA 1996), the fifth district held, consistent with the decision in HTP but before that decision came out, that claims for fraud in the inducement and breach of an employment contract, such as we have in the instant case, constituted separate and independent causes of action. In Palmer v. Santa Fe Healthcare Systems, Inc., 582 So.2d 1234 (Fla. 1st DCA 1991), a case also involving an employment contract, this court stated, "A promise as to future conduct may serve as a predicate for a claim of fraud if it is made without any intention of performing, or with a positive intention not to perform." Id. at 1236. Both Williams and Palmer, however, involved written agreements where separate and distinct oral representations induced the other contracting party to enter into the contract.
In W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc., 728 So.2d 297 (Fla. 1st DCA 1999), this court went one step further and held that a trial court wrongfully dismissed a claim for fraud in the inducement where the claim had been based upon the alleged intention of the defendant at the time of the agreement not to perform its contractual obligations. See id. at 304-305. In W.R. Townsend, as in this case, there was no written contract; the defendant's contractual liability allegedly arose out of either an oral contract or on a theory of unjust enrichment as in the instant case.
In La Pesca Grande Charters, Inc. v. Moran, 704 So.2d 710 (Fla. 5th DCA 1998), the fifth district stated that the mere fact that an alleged fraudulent representation is made a part of the contractual agreement should not extinguish an action for fraud in the inducement. See id. at 712. As the court explained in that case, "The notion that a knowing fraud perpetrated to induce someone to enter into a contract can be extinguished by the simple expedience of including the fraudulent representation in the contract makes no sense."[2]Id.
*682 Whether an oral misrepresentation as to a party's intent to perform his or her duties pursuant to a contractual arrangement will support a claim for fraud in the inducement becomes a question of some importance when considered together with the question of the availability of punitive damages on such a claim. Although punitive damages for breach of contract are barred by Florida law, see John Brown Automation, Inc. v. Nobles, 537 So.2d 614, 617 (Fla. 2d DCA 1988), punitive damages are available for fraud in the inducement. See First Interstate Dev. Corp. v. Ablanedo, 511 So.2d 536 (Fla. 1987). In First Interstate, the supreme court stated,
The overwhelming weight of authority in this state makes it clear that proof of fraud sufficient to support compensatory damages necessarily is sufficient to create a jury question regarding punitive damages.
This is so because intentional misconduct is a necessary element of fraud. Indeed, to prove fraud, a plaintiff must establish that the defendant made a deliberate and knowing misrepresentation designed to cause, and actually causing detrimental reliance by the plaintiff. We conclude that the district court correctly ruled that the punitive damage issue was for the jury, not the judge, to decide once a case for fraud had been made.
Id. at 539 (footnote omitted; internal citation omitted). See also Associated Heavy Equipment Schools, Inc. v. Masiello, 219 So.2d 465, 467 (Fla. 3d DCA 1969) (holding that question of availability of punitive damages in fraud in the inducement case is up to the jury).
The potential for recovery of both punitive damages and consequential tort damages makes the pleading of an alternative count alleging fraud in the inducement extremely tempting in breach of contract cases. In Puff `N Stuff of Winter Park, Inc. v. Bell, 683 So.2d 1176 (Fla. 5th DCA 1996), Judge Harris recognized this problem in a special concurrence when he observed that "almost any contract claim can also be framed as a fraud in the inducement action." Id. at 1179 (Harris, J., specially concurring). Judge Griffin responded in a dissenting opinion, however, that the problem should be resolved by the courts requiring specific allegations of all of the necessary elements of fraud. See id. at 1185 (Griffin, J., dissenting). Judge Griffin stated,
I agree with Judge Harris that fraud is a much overused and misused cause of action. Its abuse has been fueled by the access it provides to otherwise unavailable discovery and to punitive damages. Its misuse has been exacerbated by Florida's embrace of the "promissory" form of fraud whereby a promise made with no intent to perform is deemed actionable as fraud. Unfortunately, too many cases have gotten to the jury and large tort verdicts have been rendered on a theory of fraud that had no business being anything other than breach of contract. The problem is not with the distinction between fraud and breach of contract, however, the problem lies in our courts' failure to appreciate or require competent proof of the distinct elements. The statement that virtually any breach of contract action can be pleaded as fraud in the inducement proves the point. Every breach of contract cannot be pleaded as fraud in the inducementat least, not properly. Certainly, the classic type of fraud present in this casea knowingly false representation of factrequires a specific allegation of such a false representation. Even "promissory fraud," however, requires a specific allegation (and ultimate proof) that the promise was made with no intent to perform.
Id.
In this case, we are presented with the sufficiency of proof problem identified in Judge Griffin's dissent in Puff `N Stuff. In this case, the evidence did not establish a distinct promise or inducement other *683 than to provide compensation pursuant to the alleged employment agreement between the parties; no direct evidence was presented regarding appellants' intent at the time of the representation not to perform; and the representations testified to by Jones were, at best, only vague promises to pay Jones an undetermined amount at some future undetermined time when he returned to work. There was no breach of the essential terms of this employment agreement because Jones never returned to work.[3]
Jones essentially argues, however, that the jury must have based its finding that appellants never intended to pay him for the work on the following evidence: (1) The denials at trial by appellants' representatives of ever having promised to pay Jones for the work; and (2) the motive on the part of these representatives not to pay Jones as their profit statements would have looked appreciably better without the added expense associated with paying Jones for the revenue he had helped generate. We cannot accept these arguments given the facts as presented at trial.
First, the purported evidence supporting the asserted motive on appellants' part not to pay Jones was weak. In every case involving an employment agreement, an employer's profits are tied to expenses and will increase if the employee is paid less. For this reason, we must reject Jones' argument that the evidence supported the fraud verdict by supporting the inference of a motive on the part of appellants not to fulfill their promise to pay Jones for the work.
Second, in Stow v. National Merchandise Co., Inc., 610 So.2d 1378 (Fla. 1st DCA 1992), this court rejected a fraud in the inducement claim made by an employee against her employer which involved similar facts as those in the instant case. In Stow, an employee sued her employer for fraud in the inducement, alleging that her employer had induced her into signing a contract which purported to guarantee her salary bonuses for as long as she worked for the employer by falsely promising her that it would abide by the terms of the bonus contract. See id. at 1382. The employee in Stow alleged that her employer never intended to comply with the actual terms of the bonus contract and actually refused to abide by the terms of the bonus contract several years after the employee had signed it. See id. At the trial in Stow, the evidence showed that the employer had tried to get the employee to give up a portion of her guaranteed bonus as a consequence of past poor job performance in exchange for the assurance that she would not be fired based on her past performance. See id. at 1383-84. The evidence in Stow showed that the employee had refused this deal, had been paid the full amount of her guaranteed bonus for the previous year, and had been then immediately fired. See id. at 1382. This court held that the employer could not be held liable for fraud in the inducement on those facts because the employer had ultimately paid the employee the full amount of her guaranteed bonus pursuant to the terms of the bonus contract. See id. at 1384.[4]
While in Stow there had been no proof that the employer had denied the existence of the bonus agreement, we cannot distinguish the case based on that factor alone. If we did adopt this interpretation, a fraud claim and a possible punitive damages claim would be available in every case involving an alleged breach of a contractual agreement where the other party denies the existence of the contractual agreement. For this reason, we must reject Jones' *684 argument that the jury could have inferred appellants' intent not to pay at the time they promised to do so from the subsequent denials at trial by appellants' representatives of ever having made the promises to pay Jones for the work.
Finally, the alleged promises to pay in this case were so vague that Jones could not reasonably have relied on them to support the existence of an agreement on the part of appellants to pay him commensurate with his prior compensation package for the work he had done while disabled. See Professional Underwriters Ins. Co. v. Freytes & Sons Corp., Inc., 565 So.2d 900, 903 (Fla. 5th DCA 1990) (holding that an insured could not have reasonably relied on a vague and imprecise representation by the insurer regarding the extent of coverage such that coverage could be imposed under a theory of promissory estoppel).
The jury's verdict in favor of Jones on the fraud claim, as well as the punitive damages award which flowed solely from the fraud verdict, must be reversed. Because the trial court consolidated the award of compensatory damages for all claims for the period from August 2, 1990 through December 31, 1994, we direct the trial court on remand to recalculate the compensatory damages award for this time period without considering the fraud claim. The trial court must then recalculate, in accordance with Jones' concession in this appeal, the amount of prejudgment interest to be awarded on the amount of compensatory damages for the referenced time period. In all other respects, the judgment on appeal is affirmed.
BARFIELD, C.J., and BOOTH, J., concur.
NOTES
[1] These facts regarding Jones' duties as district sales manager before his disability came from the parties' pretrial stipulation.
[2] Judge Griffin, however, was referring to a misrepresentation of existing fact being included in the contractual agreement. As she noted,

The HTP court further explained the reason for retaining a cause of action for fraud in the inducement by quoting a widely cited Michigan case, Huron Tool and Engineering Co. v. Precision Consulting Services, Inc., 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995):
The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction drawn by a New Jersey federal district court between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.
La Pesca, 704 So.2d at 712.
[3] Jones' recovery in contract was based on an implied contract/unjust enrichment theory rather than a specific breach of contract.
[4] In Stow, we also rejected the argument that negotiations to settle a dispute would constitute evidence of fraud. See Stow, 610 So.2d at 1383-84. Jones makes the same argument in this case. We continue to reject this argument.